Filed 7/11/13

# IN THE SUPREME COURT OF CALIFORNIA

TODAY'S FRESH START, INC., )
)
     Plaintiff and Respondent, )
)          S195852
     v. )
)     Ct.App. 2/1 B212966
LOS ANGELES COUNTY OFFICE OF )
EDUCATION et al., )     Los Angeles County
)     Super. Ct. No. BS112656
     Defendants and Appellants. )
_____)
)
TODAY'S FRESH START, INC., )
)
     Plaintiff and Appellant, )
)
)     Ct.App. 2/1 B214470
     v. )
)     Los Angeles County
LOS ANGELES COUNTY OFFICE OF )     Super. Ct. No. BS112656
EDUCATION et al., )
)
     Defendants and Respondents. )
_____)

     Two decades ago, California became one of the first states in the country to authorize charter schools—public schools funded with public money but run by private individuals or entities rather than traditional public school districts. The Charter Schools Act of 1992 (Ed. Code, § 47600 et seq., added by Stats. 1992, ch. 781, § 1, pp. 3756-3761) authorized various public bodies to approve charters, supervise charter school operations, and revoke charters in the event particular

standards and conditions were not met. But the original law did not specify the procedures that would accompany a contemplated charter revocation. In 2006, the Legislature remedied that omission, adopting provisions governing the hearing on, decision on, and appeal of a charter revocation. (Ed. Code, § 47607, subds. (c)-(k), as amended by Stats. 2006, ch. 757, § 1, pp. 6012-6014.)[1]

In response to a writ petition by Today's Fresh Start, Inc., an entity challenging its school's charter revocation, we consider whether the procedures adopted by the Legislature are sufficient under the federal and state due process clauses. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) The school contends, inter alia, that it has not been afforded a hearing before an impartial adjudicator because the body deciding whether to revoke its charter has an interest in ensuring that funds flowing to charter schools are reallocated to other public schools. No such interest has been shown here; the school has not established that the Legislature's chosen procedures denied it the opportunity to be heard "at a meaningful time and in a meaningful manner" (*Armstrong v. Manzo* (1965) 380 U.S. 545, 552) by a decision maker without financial or other bias. Accordingly, we affirm the Court of Appeal's judgment denying writ relief and upholding as constitutional section 47607.

FACTUAL AND PROCEDURAL BACKGROUND

**A. *Charter Schools***

The Legislature is charged with providing a public education system for the citizens of the State of California. (Cal. Const., art. IX, § 5; *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 243.) It has long done that through the establishment of public school districts (*Matosantos*, at p. 243)

---

[1]     All further unlabeled statutory references are to the Education Code.

and, more recently, through charter schools as well (see § 47600 et seq.).[2] The Legislature intended its authorization of charter schools to improve public education by promoting innovation, choice, accountability, and competition. (See § 47601; *United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 521; *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1186.)

Charter schools are initiated by submitting a petition to the chartering authority, generally the governing board of a public school district but occasionally a county board or the State Board of Education. (§ 47605, subds. (a), (b), 47605.5, 47605.6, 47605.8; *United Teachers of Los Angeles v. Los Angeles Unified School Dist.*, *supra*, 54 Cal.4th at pp. 521-522.) Petitions should be granted whenever they are "consistent with sound educational practice" (§§ 47605, subd. (b), 47605.6, subd. (b)); a petition can be denied only if a chartering authority makes written findings that one or more statutory criteria have not been met (§ 47605, subd. (b); see *Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at p. 1186).

Once approved, charter schools are operated independently, but are subject to public oversight. (*California School Bds. Assn. v. State Bd. of Education* (2010) 186 Cal.App.4th 1298, 1305; *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1137-1142; see §§ 47601, 47615, subd. (a)(2).) Such public

---

[2]     When it enacted the Charter Schools Act in 1992, California became only the second state in the country to authorize such schools, following Minnesota by one year. (Ridley, *Charting a New Course for Public Education in Michigan— Charter Schools: A Significant Step Toward Meaningful Education Reform* (1999) 76 U. Det. Mercy L.Rev. 607, 615.) Charter schools are thus a relatively novel creation, and the process of identifying the best way to oversee and nurture them is in its early stages, both here and elsewhere.

"control and oversight . . . legitimize[s] charter schools" (*California School Bds. Assn.*, at p. 1326) and arguably is constitutionally necessary (*Mendoza v. State of California* (2007) 149 Cal.App.4th 1034, 1060-1061).  Chartering authorities must monitor schools' fiscal condition and academic performance and are authorized to investigate whenever grounds for concern arise.  (§§ 47604.32, 47604.33, 47604.4, 47604.5, 47605, subd. (k), 47607, subd. (a).)  In turn, schools must respond promptly to any reasonable inquiries from public officials charged with oversight.  (§ 47604.3.)

Though independently operated, charter schools fiscally are part of the public school system; they are eligible equally with other public schools for a share of state and local education funding.  (*Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at p. 1186; see §§ 47612, subd. (a), 47615, subd. (a), 47630 et seq.)  This hybrid nature results in a complicated relationship with other public schools.  "Obviously charter schools are not in opposition to the public school system.  On the contrary, they are a part of that system."  (*Wilson v. State Bd. of Education*, *supra*, 75 Cal.App.4th at p. 1139.)  Nevertheless, "charter schools compete with traditional public schools for students, and they receive funding based on the number of students they recruit and retain at the expense of the traditional system."  (*Wells*, at pp. 1203-1204; see *Knapp v. Palisades Charter High School* (2007) 146 Cal.App.4th 708, 717.)

Section 47607 specifies the grounds upon and manner in which a school's charter may be revoked.  (§ 47607, subds. (c)-(k).)  In broad terms, section 47607 requires the chartering authority to provide notice of violations that could lead to revocation, an opportunity to cure, notice of the intent to revoke if the school fails to cure, a public hearing, and a written decision with factual findings supporting any revocation decision.  (*Id.*, subds. (d)-(e).)  As well, the statute affords schools an administrative appeals process to contest charter revocation.  (*Id.*, subds. (f)-

4

(i).) We discuss these procedures in more detail below; they lie at the heart of this case.

With this background, we turn to the instant charter revocation dispute.

**B.** *Administrative Proceedings*

In 2003, Today's Fresh Start, Inc. (Today's Fresh Start), a nonprofit public benefit corporation, petitioned for and was granted a countywide charter to serve Los Angeles County.[3] The Los Angeles County Office of Education (County Office), a regional educational agency, issued the charter through its governing board, the Los Angeles County Board of Education (County Board).[4] In 2005, the County Board renewed the charter for a five-year term.

The charter renewal petition stipulated that the County Office would oversee Today's Fresh Start, investigating complaints and monitoring the school's operations. (See § 47607, subd. (a)(1) [chartering authority "may inspect or observe any part of the charter school at any time"].) Today's Fresh Start agreed to respond promptly to County Office inquiries concerning operational and fiscal matters. (See § 47604.3; *Knapp v. Palisades Charter High School*, *supra*, 146 Cal.App.4th at pp. 714-715 [charter schools are contractually bound by their charters].) The renewal petition authorized as grounds for revocation "a material

---

[3] Today's Fresh Start justified its request for a countywide, as opposed to districtwide, charter on the ground that in order to provide optimal educational opportunities for students, it needed to reach beyond individual cities for its student body.

[4] As is typical, Los Angeles has a county board of education, a county superintendent of education, and a county office of education. (See Cal. Const., art. IX, § 7; Ed. Code, §§ 1040-1047, 1240-1281.) The county superintendent is the head of the county office; the county board is its governing board. The power to grant or revoke a countywide charter is specifically vested in the county board (§§ 47605.5, 47605.6, 47607), but the responsibility for oversight is a shared one (see §§ 47604.3-47604.4).

5

violation of any of the conditions, standards, or procedures set forth in this Petition," failure to "pursue any of the student outcomes identified in this Petition," failure to "meet generally-accepted accounting principles," "fiscal mismanagement," or "[k]nowingly and willfully violat[ing] any provision of law."[5] The petition also provided that prior to revocation, Today's Fresh Start would receive notice of any violation and an opportunity to cure.

In June 2007, the County Office advised Today's Fresh Start that it planned to investigate concerns raised about the school, including but not limited to four areas: (1) observance of the legal rights of students, parents, and employees; (2) student attendance procedures; (3) professional development; and (4) compliance with California Department of Education testing procedures. Today's Fresh Start responded that the planned investigation violated section 47604.4 and the school's charter.[6] The next month, the County Office sent Today's Fresh Start a "Report of Findings and Recommendations," which identified deficiencies and called for improvements in each of the four identified areas. A "Corrective Action Plan" spelled out specific actions required of the school and listed due dates for completion of each.

Contemporaneously, County Superintendent Dr. Darline P. Robles, the head of the County Office, submitted a request for documents regarding the

---

[5] Section 47607 codifies essentially identical grounds for charter revocation (see *id*., subd. (c)), but permits charter revocation for a violation of law whether or not the violation is knowing or willful (*id.*, subd. (c)(1)(D)).

[6] Section 47604.4, subdivision (a) authorizes a county superintendent to, "based upon written complaints by parents or other information that justifies the investigation, monitor the operations of a charter school located within that county and conduct an investigation into the operations of that charter school." Today's Fresh Start argued that the County Office had not proven it had information warranting an investigation.

6

governance of Today's Fresh Start to determine whether the school was complying with Corporations Code provisions regulating the operation of nonprofit public benefit corporations. In August 2007, Superintendent Robles provided the school with a staff memorandum analyzing the governance materials sent to the County Office. She wrote: "Staff express serious concerns regarding the governance of the Today's Fresh Start Charter School and I share their concerns." Robles requested additional materials to allow the County Office to determine whether the school's board was holding sufficient meetings and complying with open meeting laws, and whether board members were "protecting public funds and not using their positions improperly to the end of personal enrichment." Superintendent Robles warned that the sufficiency of the school's response would dictate whether she recommended to the County Board that it initiate charter revocation proceedings.

At an October 9, 2007, County Board meeting, County Office staff member Dr. Lupe Delgado led a discussion of the staff's analysis of the school's governance structure and processes and its response to the Corrective Action Plan. County Board members were provided three binders of materials reflecting the staff's investigation; these same binders had previously been provided to Today's Fresh Start.

At the County Board's October 16 meeting, six individuals addressed the board on behalf of Today's Fresh Start. Thereafter, Superintendent Robles recommended that the County Board give notice of its intent to revoke the school's charter. The County Board voted five to zero, with two members abstaining, to approve Superintendent Robles's recommendation to begin the revocation process. A public hearing on Today's Fresh Start was scheduled for the November 6 County Board meeting. The County Office informed Today's

Fresh Start of the board's decision and advised the school that it could submit written materials at any time before the hearing to support its oral presentation.

At the November 6, 2007, public hearing, Today's Fresh Start provided the County Board with handouts detailing the school's grounds for opposing revocation and three binders containing nearly 900 pages of supporting documentation. Six Today's Fresh Start students addressed the County Board in support of the school. Five individuals, including the school's executive director, Dr. Jeanette Parker, its board chair, Dr. Clark Parker, its legal counsel, Mary Tesh Glarum, and Assemblyman Mervyn Dymally, offered arguments on behalf of Today's Fresh Start. County Office staff made no presentation.

In writing on November 19, and again at a County Board meeting on November 20, Today's Fresh Start's counsel raised concerns that the County Office's revocation procedures violated due process. The school contended the County Office's staff was both advocating that Today's Fresh Start's charter be revoked and advising the County Board regarding the revocation, in addition to having a preexisting relationship with the County Board. At the meeting, the school objected to not having an opportunity to respond to a County Office staff presentation listed on the agenda. Drs. Clark and Jeanette Parker again made appeals on behalf of their school. The staff presentation the school objected to followed: County Office staff member Dr. Lupe Delgado gave a brief chronology of the events surrounding the charter revocation process and asked for any specific items or questions the County Board would like to see addressed in the final staff report on Today's Fresh Start.

At a County Board meeting on December 4, 2007, Dr. Jeanette Parker again spoke on behalf of Today's Fresh Start. Dr. Delgado then presented the County Office's final report, which determined that Today's Fresh Start had not corrected its noncompliance with testing procedures, had not explained how it

would rectify irregularities in its governance, and had failed to meet 47 of the 53 items on the Corrective Action Plan. Dr. Delgado concluded: "After review and analysis of [Today's Fresh Start]'s rebuttal materials and presentations, [the County Office] stands by its original recommendation that substantial evidence exists of violations of the charter, failure to meet or pursue pupil outcomes as set out in the charter, i.e. testing irregularities, and violations of the law. [Today's Fresh Start] has been notified of these violations and has had a reasonable opportunity to correct [them], and has not done so." Today's Fresh Start promptly submitted a written response to the report.

At the following week's December 11 County Board meeting, six speakers addressed the County Board on the school's behalf. Dr. Jeanette Parker defended its testing procedures. Today's Fresh Start's fiscal coordinator assured the County Board that the school had promptly complied with reporting responsibilities. Assemblyman Dymally asked the County Board to give the school one more year. Dr. Clark Parker argued that the revocation process was flawed. Two speakers emphasized Today's Fresh Start's performance in comparison to other public schools.

After further debate, the County Board voted four to three to revoke Today's Fresh Start's charter. The County Board adopted factual findings regarding improprieties in student testing procedures, violations of statutory and charter provisions regulating corporate governance, and the failure to correct numerous shortcomings identified in the Corrective Action Plan, all in violation of section 47607, former subdivision (c)(1), (2), and (4). (Stats. 2006, ch. 757, § 1, p. 6012, redesignated as subd. (c)(1)(A), (B), and (D) by Stats. 2012, ch. 576, § 3.)

Today's Fresh Start appealed its charter revocation to the State Board of Education (State Board) on grounds, inter alia, that the revocation proceedings violated due process and revocation was not based on substantial evidence. (See

9

§ 47607, subd. (g).) The State Board heard argument from speakers for both Today's Fresh Start and the County Office, considered a report from the Charter Schools Division of the California Department of Education, and ultimately affirmed the revocation by an equally divided vote, four to four.

### C. *Judicial Proceedings*

Today's Fresh Start challenged its charter revocation by filing a petition for writ of administrative mandamus. (See Code Civ. Proc., § 1094.5.) In a motion for judgment under Code of Civil Procedure section 1094, the school sought reinstatement of the charter on three grounds: (1) the County Board violated section 47607, subdivision (d) by failing to provide the school with notice and an opportunity to cure; (2) the County Board deprived the school of due process by adjudicating the matter when it was not an impartial decision maker; and (3) the County Office failed to introduce any evidence in support of revocation at the November 6, 2007, public hearing.

The trial court granted the motion on the last two grounds and issued a writ setting aside the revocation and remanding to the County Board for further proceedings. After noting that Today's Fresh Start's liberty and property interests in its charter were undisputed, the court concluded the revocation procedure violated section 47607 and due process. First, both section 47607, subdivision (e) and due process required that all evidence supporting revocation be introduced at the public hearing. Second, although Today's Fresh Start was statutorily entitled only to a public hearing before the County Board in the normal course of business (§ 47607, subd. (e)), the statute was unconstitutional to the extent it afforded less process than was constitutionally owed. Due process guaranteed Today's Fresh Start an "evidentiary hearing before a[n] unbiased hearing officer"; the County Board, in the trial court's eyes, could not act as an impartial decision maker in the first instance. Accordingly, on remand, the County Office would have to conduct

a separate evidentiary hearing presided over by a neutral third party or County Office employee uninvolved in the revocation process, with the hearing officer's findings to be thereafter accepted or rejected by the County Board at a subsequent public hearing.

The Court of Appeal reversed, unanimously rejecting both trial court grounds for granting relief. First, the County Office was not required to formally present its evidence so long as it otherwise disclosed the basis for seeking revocation. Statutorily, nothing in the plain text of section 47607, subdivision (e) mandated formal presentation; constitutionally, procedural informality was routinely permitted in administrative proceedings. Second, due process did not mandate an additional, prehearing hearing because nothing in the school's evidence or argument established that the County Board could not act impartially. Today's Fresh Start was required to demonstrate " ' "an unacceptable probability of actual bias" ' " (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483); this it had not done. Consequently, there was no reason why the County Board could not act in the first instance on Today's Fresh Start's charter revocation, and the revocation procedures selected by the Legislature (see § 47607, subds. (c), (d), (e)) satisfied due process.

We granted review to resolve important questions of first impression concerning the constitutionality of section 47607's charter revocation procedures.

DISCUSSION

## I. *Due Process Principles*

Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any property interest. (U.S. Const., 14th Amend. ["nor shall any state deprive any person of life, liberty, or property, without due process of law"]; Cal. Const., art. I, § 7, subd. (a) ["A person may not be deprived of life, liberty, or property without due process of law . . . ."].) In

11

light of the virtually identical language of the federal and state guarantees, we have looked to the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause and have treated the state clause's prescriptions as substantially overlapping those of the federal Constitution. (See, e.g., *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 736-737.)

"The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " (*Mathews v. Eldridge* (1976) 424 U.S. 319, 348; see *Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 546.) The opportunity to be heard must be afforded "at a meaningful time and in a meaningful manner." (*Armstrong v. Manzo*, *supra*, 380 U.S. at p. 552; accord, *People v. Allen* (2008) 44 Cal.4th 843, 869.) To ensure that the opportunity is meaningful, the United States Supreme Court and this court have identified some aspects of due process as irreducible minimums. For example, whenever "due process requires a hearing, the adjudicator must be impartial." (*Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025; see *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 876; *Withrow v. Larkin* (1975) 421 U.S. 35, 47.)

Beyond these broad outlines, however, the precise dictates of due process are flexible and vary according to context. (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 334 [" ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances' "]; *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 391 & fn. 16.) " 'The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and

12

quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.' " (*Heller v. Doe* (1993) 509 U.S. 312, 332.) Accordingly, the United States Supreme Court has rejected absolute rules in favor of balancing three considerations: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews*, at p. 335; see *Turner v. Rogers* (2011) 564 U.S. ___, ___ [131 S.Ct. 2507, 2517-2518]; *Wilkinson v. Austin* (2005) 545 U.S. 209, 224-225.)

With a minor modification, we have adopted the *Mathews* balancing test as the default framework for analyzing challenges to the sufficiency of proceedings under our own due process clause. The first three factors—the private interest affected, the risk of erroneous deprivation, and the government's interest—are the same. (See, e.g., *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347; *In re Sade C.* (1996) 13 Cal.4th 952, 986-987.) In addition, we may also consider a fourth factor, " 'the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official.' " (*People v. Allen*, *supra*, 44 Cal.4th at pp. 862-863; accord, *Oberholzer v. Commission on Judicial Performance*, *supra*, 20 Cal.4th at pp. 390-391.)

As the case in which we announced the additional state factor makes clear, however, dignitary interests play a role only when the rights of natural persons are at stake: "The federal approach also undervalues the important due process interest in recognizing the dignity and worth of *the individual* by treating him as an equal, fully participating and responsible member of society. [Citations.] 'For

13

government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as *a nonperson*, an object, rather than a respected, participating citizen.' [Citation.] Thus, even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, 'to ensure that the method of interaction itself is fair in terms of what are perceived as minimum standards of political accountability—of modes of interaction which express a collective judgment that *human beings* are important in their own right, and that they must be treated with understanding, respect, and even compassion.' [Citation.]" (*People v. Ramirez* (1979) 25 Cal.3d 260, 267-268, italics added.) Accordingly, the fourth factor plays no role where, as here, due process rights are asserted by an entity rather than an individual. Consequently, in this case the starting point for our analysis under the state and federal Constitutions is the same.

The requirements of due process extend to administrative adjudications. (*Withrow v. Larkin*, *supra*, 421 U.S. at p. 46; *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737.) Relevant here, the bar against financially interested adjudicators applies with as much force to administrative adjudicators as to judicial officers. (*Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1027.) In many other respects, however, administrative hearings need not be conducted with the same rigor demanded of judicial proceedings: "[D]ue process allows more flexibility in administrative process than judicial process . . . ." (*Ibid.*; see *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219 ["The standard of impartiality required at an administrative hearing is less exacting than that required in a judicial proceeding."].)

With these principles in mind, we turn to Today's Fresh Start's due process claims.

14

**II.** *Property Interest*

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' [Citations.] Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." (*American Mfrs. Mut. Ins. Co. v. Sullivan* (1999) 526 U.S. 40, 59; see also *Cleveland Board of Education v. Loudermill*, *supra*, 470 U.S. at p. 538 & fn. 3.) Today's Fresh Start acknowledges it has no entitlement to issuance of a charter in the first instance, but asserts that, once a charter has been granted, it has a property interest in continuing operation of its school. (See *California Assn. of Private Special Education Schools v. Department of Education* (2006) 141 Cal.App.4th 360, 372-376.) The County Office, as it has throughout this litigation, concedes the school has a protected property interest for due process purposes. We thus assume the existence of such an interest.

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" (*Cleveland Board of Education v. Loudermill*, *supra*, 470 U.S. at p. 541; accord, *People v. Allen*, *supra*, 44 Cal.4th at p. 862.) Today's Fresh Start challenges the predeprivation procedures it was afforded in three respects: (1) the County Board is financially biased; (2) the County Board's reliance on input from the County Office violates separation of function principles; and (3) the school was afforded inadequate notice of the case against it.

**III.** *Financial Bias and the Guarantee of an Impartial Decision Maker*

"When, as here, an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal. [Citation.] A fair tribunal is one in which the judge or other decision maker is free of bias for or against a party." (*Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737.) "Of all the types of bias that can affect adjudication, pecuniary interest has long received the most

15

unequivocal condemnation and the least forgiving scrutiny." (*Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1025.)  The state and federal Constitutions forbid the deprivation of property by a judge with a " 'direct, personal, substantial, pecuniary interest in reaching a conclusion against' " a party.  (*Haas*, at p. 1025, quoting *Tumey v. Ohio* (1927) 273 U.S. 510, 523.)

Today's Fresh Start contends the members of the County Board have such a disqualifying pecuniary interest:  (1) the County Office, like other county offices of education, is authorized to and does operate public schools; (2) because charter schools like Today's Fresh Start necessarily compete with other public schools for students, and the funding that follows them (see §§ 47612, subd. (a), 47615, subd. (a), 47630 et seq.; *Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at pp. 1203-1204), public school officials have an incentive to revoke charters to maximize funding available to their own schools; and (3) numerous cases have recognized that adjudication of one's interests by a business competitor with a conflicting financial interest violates due process.

Though Today's Fresh Start makes financial bias a centerpiece of its due process argument before us, the school concedes it did not raise the issue below. While that omission would be grounds to consider the issue forfeited, we have discretion to consider on appeal purely legal issues raised in a petition for review or answer (Cal. Rules of Court, rule 8.516(b)(1); *Goldstein v. Superior Court* (2008) 45 Cal.4th 218, 225, fn. 4), and we do so here.  The failure to present the argument below is not without consequence, however.  Because Today's Fresh Start did not develop a record concerning the County Office's actual operation of schools allegedly in competition with the charter school, the school's as-applied challenge is limited to matters we may judicially notice or that the County Office concedes.  Beyond that, the school may present a facial challenge to the statutory structure established by the Legislature, but must show that county boards of

16

education intrinsically have a financial interest of a kind and magnitude sufficient to disqualify them from serving in charter revocation hearings as the impartial adjudicators due process guarantees.

Claims that an adjudicator is biased are not subject to balancing under the federal *Mathews* or state *Mathews*-plus test. (*Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at pp. 1035-1036.)[7] Moreover, where the basis for a challenge is an alleged pecuniary interest, the presumption of impartiality that would otherwise apply has no place. (*Haas*, at p. 1026.) Instead, due process is violated whenever a decision maker has a financial interest that "would offer a possible temptation to the average person as judge not to hold the balance nice, clear and true." (*Ibid.*; accord, *Caperton v. A. T. Massey Coal Co.*, *supra*, 556 U.S. at p. 878; *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813, 825.)[8] Conclusive proof of actual bias is not required; an objective, intolerably high risk of actual bias will suffice. (*Caperton*, at pp. 883-884; *Haas*, at pp. 1032-1034.)

To begin, we note the cases Today's Fresh Start principally relies upon are not strictly analogous because, unlike the circumstances alleged here, they involved adjudicators who stood to receive a benefit to their *personal* fisc. (See *Tumey v. Ohio*, *supra*, 273 U.S. at p. 523 [a judge may not preside over a case in

---

[7] As we explained in *Haas*, *Mathews* balancing focuses principally on identifying procedures that will ensure accurate adjudications, while the policies underlying the guarantee of a disinterested decision maker extend beyond minimizing the risk of error to ensuring that our legal systems comport with fundamental notions of justice. " 'In Justice Holmes' famous phrase, "even a dog distinguishes between being stumbled over and being kicked." ' " (*Haas v. County of San Bernardino*, *supra*, 27 Cal.4th at p. 1036.)

[8] The rule against financial interests stops short of zero tolerance; the United States Supreme Court has recognized that slight pecuniary interests are not constitutionally cognizable. (*Aetna Life Insurance Co. v. Lavoie*, *supra*, 475 U.S. at pp. 825-826, fn. 3.)

which he or she has a "direct, *personal*, substantial, pecuniary interest" (italics added)].)  In *Gibson v. Berryhill* (1973) 411 U.S. 564, the United States Supreme Court found a due process violation where a state's optometry board was comprised of independent optometrists, who were granted authority to conduct disciplinary hearings of corporate-employed optometrists.  License revocation of corporate optometrists would enhance the business opportunities of independent optometrists; the optometry board members thus had a personal financial incentive to impose discipline.  (*Id.* at pp. 578-579.)  A line of state cases relied upon by Today's Fresh Start similarly recognizes that an administrative board composed of members whose personal businesses could benefit from the board's rulings violates due process.  (See *University Ford Chrysler-Plymouth, Inc. v. New Motor Vehicle Bd.* (1986) 179 Cal.App.3d 796; *Nissan Motor Corp. v. New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109; *Chevrolet Motor Division v. New Motor Vehicle Bd.* (1983) 146 Cal.App.3d 533; *American Motors Sales Corp. v. New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983.)  Each case found wanting the New Motor Vehicle Board, a state board charged with, inter alia, resolving motor vehicle dealer-manufacturer disputes, whose composition must include four new motor vehicle dealers, but need not include any manufacturer representatives, among its nine members.  (See Veh. Code, §§ 3000, 3001.)  In any given dispute, the courts observed, a dealer might have one of several personal financial incentives:  to rule against a dealer (to stifle competition), in favor of a manufacturer (to curry favor with an entity that supplied the dealer vehicles), or in favor of a narrow reading of the circumstances in which a franchise could be terminated (to minimize the dealer's risk of losing its own dealership).  (See

18

*Chevrolet Motor Division*, at p. 537; *American Motors Sales Corp.*, at p. 987.)
Adjudication by decision makers with such personal financial stakes cannot be
reconciled with due process.[9]  Here, in contrast, Today's Fresh Start has identified
no personal financial benefit that might impair the ability of members of the
County Board to act as disinterested decision makers; County Board members are
not personally in competition with charter schools, and their salaries are
unaffected by any decision they might reach in a revocation proceeding.

   The due process violation in *Tumey v. Ohio*, *supra*, 273 U.S. 510, arose not
only from the "direct pecuniary interest" the mayor had in each case but also from
his institutional interest:  the mayor's "official motive to convict and to graduate
the fine to help the financial needs of the village." (*Id.* at p. 535.)  Subsequently,
the United States Supreme Court has confirmed that institutional financial interests
alone, even without any corresponding personal benefit, may compromise due
process.  (*Ward v. Village of Monroeville* (1972) 409 U.S. 57; see also *Caperton v.
A. T. Massey Coal Co.*, *supra*, 556 U.S. at p. 878; *Haas v. County of San
Bernardino*, *supra*, 27 Cal.4th at p. 1028, fn. 14.)  In *Ward*, the Supreme Court
considered whether a village mayor sitting as a judge trying traffic and ordinance
violations and imposing fines that contributed a " 'substantial portion' " of the
village's budget had a disqualifying financial interest.  (*Ward*, at p. 59.)  It
concluded that, no less than in cases where fines imposed would directly enhance
a judge's salary (see *Tumey*, at pp. 520, 535), this arrangement offered an
impermissible " 'possible temptation' " to partisanship (*Ward*, at p. 60).

---

**9**    The Legislature subsequently acknowledged and rectified the problem by
mandating recusal of the four dealer board members from dealer-manufacturer
disputes.  (See Veh. Code, § 3066, subd. (d), as amended by Stats. 1985, ch. 1566,
§ 2, p. 5776.)

19

But even such an institutional interest as that evident in *Ward* has not been demonstrated here.  In *Ward*, the mayor-cum-judge had an impermissible incentive to maximize village revenue—for which he was responsible and from which his own salary was paid—at the expense of parties for whom he bore no responsibility.  (*Ward v. Village of Monroeville*, *supra*, 409 U.S. at p. 60.)  Here, in contrast, charter schools are public schools for academic and funding purposes (§ 47612, subd. (c); *Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at pp. 1200-1201), and Today's Fresh Start has pointed to nothing in the statutory scheme that would create an incentive for the County Board or individual board members to favor one public school over another in discharging the duty to promote beneficial educational opportunities for all students in the county.

Today's Fresh Start hinges its as-applied argument on proof that the County Office operates its own schools and that those schools in fact compete with Today's Fresh Start for students and funding.  The school is constrained by its failure to develop the argument below; there is no evidence of this in the record. While the County Office concedes it operates a few specialized schools aimed principally at high school students, Today's Fresh Start serves only kindergarten through eighth grade.  Today's Fresh Start thus has not shown any incentive on the part of the County Board to disfavor the charter school in preference for schools operated by the County Office.

To the extent Today's Fresh Start's argument may be read as a facial challenge to county boards adjudicating whether to revoke countywide charters, this argument fails too.  The standard for a facial constitutional challenge to a statute is exacting.  It is also the subject of some uncertainty.  (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39; *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 502.)  However, as in *Zuckerman* and *Kasler*, we need not settle the precise formulation of the standard because under any of the versions we have

articulated the due process claim here would fail.  To resolve a facial challenge, we consider "only the text of the measure itself, not its application to the particular circumstances" of this case.  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  Even under the least onerous phrasings of the test, Today's Fresh Start must show that having county boards adjudicate charter revocations will create due process problems in at least " 'the generality' " (*California Teachers Assn. v. State of California*, *supra*, 20 Cal.4th at p. 347) or "vast majority" (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 343) of cases (see *Kasler*, at p. 502; *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126).

County boards do not operate public schools (see generally §§ 1040-1047), though they are in some instances the governing boards for schools operated by county offices of education (e.g., § 52310.5, subd. (c)).  In turn, the schools county offices run are not for the general student population, but instead offer specialized vocational or technical training  or educate specialty groups, including students who are homeless, on probation, in juvenile halls, or have been expelled from other schools.  (See, e.g., §§ 1981, 48645.2, 48660 et seq., 52300 et seq.)  A private entity can submit a petition to serve this same niche (see § 47605.5), but Today's Fresh Start did not; instead, it sought and received a countywide charter to serve the general student population.  Such general countywide charters are designed by the Legislature not to compete with services provided by county offices of education, but instead to complement them:  "[A] county board of education may also approve a petition for the operation of a charter school that operates at one or more sites within the geographic boundaries of the county and that *provides instructional services that are not generally provided by a county office of education*."  (§ 47605.6, subd. (a)(1), italics added.) This provision effectively precludes any competition for students, or the funding

21

that follows them, between countywide charter schools and schools operated by county offices of education.

Thus, nothing in either the statutory scheme or the record reveals a financial incentive for the County Board or its individual members to be predisposed in favor of a school's charter revocation. Accordingly, we find no financial bias that would have deprived Today's Fresh Start of an impartial adjudicator.[10]

## IV. *Separation of Functions*

### A. Overlapping Functions and Due Process

Absent a financial interest, adjudicators are presumed impartial. (*Withrow v. Larkin*, *supra*, 421 U.S. at p. 47; *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737.) To show nonfinancial bias sufficient to violate due process, a party must demonstrate actual bias or circumstances " 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' " (*Morongo Band*, at p. 737, quoting *Withrow*, at p. 47.) The test is an objective one. (*Caperton v. A. T. Massey Coal Co.*, *supra*, 556 U.S. at p. 883; *People v. Freeman* (2010) 47 Cal.4th 993, 1001.) While the "degree or kind of interest . . . sufficient to disqualify a judge from sitting 'cannot be defined with precision' " (*Aetna Life Insurance Co. v. Lavoie*, *supra*, 475 U.S. at p. 822), due process violations generally are confined to "the exceptional case presenting extreme facts" (*Freeman*, at p. 1005). Today's Fresh Start contends this is such an exceptional case because the County Office and its governing board failed to

---

**10** At issue is the constitutionality of section 47607, subdivision (e), as applied to revocations by county offices of education. We are not presented with, and do not consider, whether the statute satisfies due process in the far more common instance where a local school district is the chartering authority.

observe minimum constitutionally required separation between adjudicative, investigatory, and accusatory functions.

The Legislature has vested responsibility for the authorization of charters, oversight of charter schools, and revocation of charters in unitary administrative agencies. In the majority of cases, these tasks are handled by individual public school districts (§ 47605); in the rarer case of countywide charters like the one at issue here, they are handled by a county office of education and its board (§§ 47605.5, 47605.6). The chartering authority is charged with monitoring for charter violations and other statutorily established grounds for revocation, and determining, after notice and a hearing, whether grounds for revocation exist. (§§ 47604.32, 47607, subds. (c)-(e).)

Asking an individual administrative agency to assume multiple roles in this fashion is neither uncommon nor per se unconstitutional. (*Withrow v. Larkin*, *supra*, 421 U.S. at p. 52.) In the search for the optimal allocation of administrative functions, "[n]o single answer has been reached." (*Id.* at p. 51.) Recognizing this, neither the United States Supreme Court nor we have treated the state or federal Constitution as a straightjacket limiting legislatures to but one permissible approach. In particular, the due process clause does not mandate importation of the adversary trial model into the administrative context in all or even most cases. (See *Mathews v. Eldridge*, *supra*, 424 U.S. at p. 348 ["[D]ifferences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.' "]; *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575, 1581 ["[T]he pure adversary model is not entitled to constitutionally enshrined exclusivity as the means for resolving disputes in '[t]he incredible variety of administrative mechanisms [utilized] in this country . . . .' "]; 2 Pierce, Administrative Law Treatise (5th ed. 2010) Separation of Functions, § 9.9, p. 883

["[T]he strict agency-based separation of functions approach we have chosen in the criminal justice context is extremely expensive and inefficient," and is not automatically the best approach for administrative disputes].)

Instead, a legislature may adopt an administrative procedure in which the same individual or entity is charged both with developing the facts and rendering a final decision, and separate adversarial advocates are dispensed with. Rejecting a separation-of-functions challenge to proceedings in which an administrative law judge was required both to investigate and to decide, the United States Supreme Court explained: "Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity. The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts." (*Richardson v. Perales* (1971) 402 U.S. 389, 410.) Proceedings of this sort "are inquisitorial rather than adversarial." (*Sims v. Apfel* (2000) 530 U.S. 103, 111.) The federal Constitution does not prohibit them. (*Withrow v. Larkin*, *supra*, 421 U.S. at p. 52 [" '[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process . . . .' "]; see also *Howitt v. Superior Court*, *supra*, 3 Cal.App.4th at p. 1581 ["The mere fact that the decision maker or its staff is a more active participant in the factfinding process—similar to the judge in European civil law systems—will not render an administrative procedure unconstitutional."].)

Even an agency's participation in an accusatory portion of administrative proceedings need not give rise to constitutional concerns. In *Withrow v. Larkin*, *supra*, 421 U.S. 35, the United States Supreme Court considered a due process challenge to an administrative board authorized to investigate professional misconduct, issue charges, adjudicate those charges, and impose discipline. The

24

court explained:  "It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings.  This mode of procedure . . . does not violate due process of law."  (*Id.* at p. 56.)  At the extreme, the Supreme Court has countenanced proceedings where a single individual may act as investigator, prosecutor, and decision maker.  (See *Goss v. Lopez* (1975) 419 U.S. 565, 581-584.)  Thus, the general rule endorsed by both the United States Supreme Court and this court is that "[b]y itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions."  (*Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 737; see *Sheldon v. S.E.C.* (11th Cir. 1995) 45 F.3d 1515, 1518 [" '[I]t is uniformly accepted that many agencies properly combine the functions of prosecutor, judge and jury.' "].)

　　　　To prove a due process violation based on overlapping functions thus requires something more than proof that an administrative agency has investigated and accused, and will now adjudicate.  "[T]he burden of establishing a disqualifying interest rests on the party making the assertion."  (*Schweiker v. McClure* (1982) 456 U.S. 188, 196.)  That party must lay a "specific foundation" for suspecting prejudice that would render an agency unable to consider fairly the evidence presented at the adjudicative hearing (*Withrow v. Larkin*, *supra*, 421 U.S. at p. 55); it must come forward with "specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias" (*Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 741; see *Gai v. City of Selma*, *supra*, 68 Cal.App.4th at p. 220 [to prove bias, a party must present "concrete facts"]).  Otherwise, the presumption

25

that agency adjudicators are people of " 'conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances' " will stand unrebutted. (*Withrow*, at p. 55.)

### B. The Evidence of Actual Bias

We consider whether Today's Fresh Start has presented "specific evidence" (*Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at p. 741) that this is the "exceptional case" (*People v. Freeman*, *supra*, 47 Cal.4th at p. 1005) involving a constitutionally unacceptable risk of actual bias. Today's Fresh Start identifies two points of structural overlap between the County Office and its governing board, the County Board. Superintendent Robles recommended revocation based on the County Office's investigation; as county superintendent she was also, by statute, the ex officio secretary and executive officer of the County Board. (§ 1010.) Additionally, Shari Kim Gale was general counsel for both the County Office and its governing board. As well, the school relies on remarks it contends demonstrate the County Board over-relied on staff and failed to act as a neutral adjudicator. We find no due process violation.

In *Griggs v. Board of Trustees* (1964) 61 Cal.2d 93, we held that where a school district's superintendent recommended a sanction against a party and thereafter took no role in the adjudicator's decision whether to impose the recommended sanction, no constitutional difficulties arose. There, a teacher challenged as a violation of due process the administrative proceedings that led to her termination. The school district's superintendent filed an accusation; thereafter, the school district's board of trustees (of which the superintendent was the chief executive officer) afforded the teacher a hearing and upheld the termination. The board of trustees was permitted to presume the superintendent's recommendation was correct—subject to reevaluation in light of the hearing evidence—and was permitted to conduct the hearing itself without relying on an

26

outside hearing officer. (*Id.* at pp. 97-98.) The superintendent did not participate in the deliberations; that separation of functions was sufficient. (*Id.* at pp. 98-99.)

So too here, Superintendent Robles had a statutory duty to monitor and, if concerns arose, investigate Today's Fresh Start's operations. (§ 47604.4, subd. (a).) Based on that investigation, she ultimately recommended revocation of Today's Fresh Start's charter. Notwithstanding her ex officio title as executive officer of the County Board, she had no role in the board's adjudicative processes and did not participate in the vote on whether to revoke Today's Fresh Start's charter. Her actions thus pose no due process problem.

The same is true of the actions of Sheri Kim Gale, general counsel of both the County Office and the board. Today's Fresh Start repeatedly characterizes her as a prosecutor, but this misstates both the nature of the proceedings and Gale's role. The County Board was charged with considering and weighing the fruits of the staff investigation and what it showed in favor of and against revocation, as well as the argument and evidence of Today's Fresh Start. Statutorily, the County Office and County Board had no agenda, no stake in one outcome or the other. Thus, like many administrative proceedings the United States Supreme Court and we have previously approved, this was not a classic adversarial hearing, with a prosecutor and a defendant. There was no prosecutor here. Gale presented no evidence, examined no witnesses, and made no argument in favor of revocation. Instead, Gale's role was to advise the County Board on its duties in deciding whether to direct charter revocation, just as she had previously advised County Office staff as to their powers and responsibilities when conducting an investigation of Today's Fresh Start. In neither capacity was she charged with being an advocate or an adjudicator.

The four cases Today's Fresh Start principally relies upon to establish that Gale's actions violated due process are each inapposite.

27

In *Howitt v. Superior Court*, *supra*, 3 Cal.App.4th 1575, the same county counsel's office represented the county against an employee in a grievance proceeding and was prepared to advise the quasi-independent adjudicatory body tasked with deciding the grievance. The Court of Appeal concluded this dual role was permissible, but only if a screening procedure between prosecutors and advisors was instituted to avoid the specter of "a hearing in which [a single attorney] representing a county department raises an objection and then excuses himself from counsel table to consult with the Board members as to whether the objection should be sustained." (*Id.* at p. 1582.) Unlike the county counsel's office in *Howitt*, Gale was not tasked with defending her agency's past actions before a third party adjudicator she simultaneously advised; rather, she was advising a unitary agency on the fulfillment of its statutory responsibilities in overseeing a regulated entity. Neither the United States Supreme Court nor we have held that due process requires subdivision of that role into separate parts.

*Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695 involved a transparent due process violation: the same person who initiated the refusal to renew a government contract sat on the appellate panel that reviewed that administrative action (*id.* at p. 701) and thus "was in the position of judging the correctness of his own decision" (*id.* at p. 710). Of course, " '[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.' " (*Caperton v. A. T. Massey Coal Co.*, *supra*, 556 U.S. at p. 876, quoting Madison, The Federalist No. 10 (Cooke ed. 1961) p. 59; see *In re Murchison* (1955) 349 U.S. 133, 136.) The proceedings here involved no similar overlap; the County Board was deciding in the first instance whether to revoke a charter, not reviewing a decision already reached by one or another of its own board members.

28

In *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, the same legal counsel represented a city in connection with a business permit denial and then advised the third party hearing officer on administrative appeal from that denial.  This violated due process because the attorney was in a position to advise on legal rulings and evidentiary objections in the adversarial appeal of an initial decision he had helped obtain.  (*Id.* at pp. 90-94.)  Gale was not involved in the appeal of a decision she had helped obtain; rather, she was counseling the County Board, as she had County Office staff, in connection with the same task: the initial decision whether Today's Fresh Start's charter should be revoked.

Finally, in *Quintero v. City of Santa Ana* (2003) 114 Cal.App.4th 810, the Court of Appeal followed *Howitt v. Superior Court*, *supra*, 3 Cal.App.4th 1575, in concluding that the same public counsel's office can both represent one party in a contested hearing and advise the third party adjudicator, so long as sufficient separation is put in place between the advocate and adjudicator.  In *Quintero*, the plaintiff was discharged from city employment and his discharge was upheld on appeal by an independent administrative board.  Because counsel for the city in the appeal had an extensive history advising the independent administrative board adjudicating the appeal of the city's decision to dismiss its employee, the Court of Appeal found a due process violation.  (*Quintero*, at pp. 815-817.)  As with *Nightlife Partners, Ltd. v. City of Beverly Hills*, *supra*, 108 Cal.App.4th 81, an attorney's role in the conduct of an appeal conflicted with his earlier role.  No similar appeal is at issue here.

Next, Today's Fresh Start cites remarks by one board member, Angie Papadakis, that allegedly establish the County Board as a whole gave excess deference to the County Office staff and its recommendations.  Referring to a County Office staff report and three volumes of supporting documentation concerning Today's Fresh Start's compliance with its charter and state law,

Papadakis indicated she "value[d] the work and the responsibility of the staff that spent all this time looking—compiling three books of what they discovered, what they are responsible for, what their job was" and "I did not pile through those three books, those three—you know, I did not go through those."

To the extent Today's Fresh Start relies on these remarks to assert that Papadakis, or the board as a whole, simply rubber-stamped the recommendations of the County Office staff without independently considering all the evidence or the presentation and arguments of the school, they cannot bear the weight of that argument. The comments were made at the October 16, 2007, meeting at which the board first authorized issuance of notice to Today's Fresh Start of an intent to revoke its charter. They preceded by weeks the November 6 public hearing at which the school presented evidence and argument, the November 20 meeting at which the board again considered the matter, the December 4 meeting at which the County Office presented its final report and the school again presented argument, and the December 11 meeting at which the County Board finally voted on revocation. The board and its individual members had ample time between October 16 and December 11 to consider all sides and all the evidence before reaching their own conclusion.

More generally, reliance on agency staff to investigate a matter does not disqualify a board or commission from thereafter ruling impartially. In *Kloepfer v. Commission on Judicial Performance* (1989) 49 Cal.3d 826, for example, a judge argued that the Commission on Judicial Performance was tainted because its own staff had conducted the initial investigation and recommended initiation of proceedings. We rejected the due process challenge, noting that these facts failed to demonstrate "actual bias" and the argument was "contrary to existing authority." (*Id.* at p. 833; see, e.g., *Withrow v. Larkin*, *supra*, 421 U.S. at p. 54, fn. 20; *Griggs v. Board of Trustees*, *supra*, 61 Cal.2d at pp. 97-98; *F. T. C. v.*

*Cinderella Career and Finishing Schools, Inc.* (D.C. Cir. 1968) 404 F.2d 1308, 1315.) Reliance on staff necessarily implies a degree of confidence in, and gratitude for, the work individuals perform in accumulating evidence and developing recommendations. The board member's comments demonstrate no more than that.

Finally, Today's Fresh Start points to remarks County Office and County Board Counsel Gale made at a November 20, 2007, meeting as proof of the board's partiality. In a November 19 letter, Today's Fresh Start argued that County Office staff's participation in investigating the school and recommending revocation violated due process. It further argued that due process forbade any communication between County Office staff and the County Board concerning the revocation, and asked the board to "advise staff that they may <u>not</u> communicate, directly or indirectly, with the Board regarding the revocation." At the next day's meeting, a board member sought a response from legal counsel. Gale explained that staff were not acting as adversarial advocates seeking to persuade an adjudicator, but as advisers to the entity statutorily charged in the first instance with authorizing and, when necessary, deciding to revoke a school's charter and, accordingly, that ex parte contacts were entirely permissible: "This is your charter school. [¶] In this matter the superintendent and staff are not the authorizer, and in our capacity we all advise the board in making this very important decision. *It is not* [*County Office*] *staff versus* [*Today's Fresh Start*]*'s staff.* The legal burden is on you, the board of [the County Office], to determine whether there is substantial evidence to revoke your charter school. [¶] The [Education Code] provides for an appeal to the State Board of Education, and that is the due process stage. *It is at that stage where there should be no one-sided communications, each side should have independent counsel.* And most important, the adjudicator is the State Board of Ed[ucation], and it is neutral. In this matter, in this process, *you are not*

31

*neutral. You are the authorizer.* [¶] Essentially this is the same process we use to evaluate new petitions that come to this board. We use literally the same spectrum of expert—technical expert staff, there is a public hearing, there is a report of staff, and then there is a recommendation upon which our board votes. [¶] So with all due respect, we do disagree and still maintain that our process is entirely legal." (Italics added.)

Today's Fresh Start's position, that County Office staff's participation in investigating and offering a recommendation violated due process, was incorrect, as we have explained. Its position that the staff were advocates, and thus that the board should be prohibited from communicating with its own staff, was similarly incorrect. (See *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, *supra*, 45 Cal.4th at pp. 738-739 [" '[s]eparation of functions must be defined and administered in ways that permit decisionmakers access to needed staff advice except in cases where the adviser has significant adversarial involvement in the case under decision.' "].) In context, it is apparent Gale was arguing not that the County Board was partial, but that its relationship with its own staff was not that of a neutral adjudicator presiding over an adversarial hearing, and thus the board was not prohibited from ex parte contacts with staff members, who were acting as advisors rather than as distinct party-advocates. In that estimation, she was correct.[11]

---

[11] Notably, the County Board member Gale was responding to, Leslie Gilbert-Lurie, then offered her own understanding of the board's role and relationship with staff in light of Gale's remarks: "It's how I interpret our role. You're our staff, and so it's not a matter of our team versus another team. We form the best opinions we can make based on the information we gather through our own questions and through the information our staff brings us." Quite properly, the County Board did not see its staff's role as prosecutorial or even distinct from the

*(footnote continued on next page)*

At its heart, Today's Fresh Start's argument rests on the notion that engaging in an administrative investigation and forming opinions based on the fruits of that investigation yields the sort of extrinsic bias the due process clause was intended to prohibit. That view has long been repudiated. To choose but one example, the United States Supreme Court in *Trade Comm'n v. Cement Institute* (1948) 333 U.S. 683 considered the constitutionality of the Federal Trade Commission's structure. Charged with preventing unfair methods of competition, the commission investigated business practices in the cement industry, issued a complaint, held a formal hearing, and issued a cease and desist order. An industry trade group challenged the order, arguing that the commission was biased by its investigation, had prejudged the matter, and could not serve as an impartial adjudicator. The Supreme Court disagreed. Even assuming that the entire commission had formed the view, based on its investigation, that the cement industry was engaged in unlawful price fixing, that view did not prevent members of the cement industry from producing voluminous evidence, presenting testimony and argument, and persuading the commission to revise its conclusions. (*Id.* at p. 701.) Congress intended to establish a unitary administrative agency whose members would develop expertise with respect to the industries they oversaw. Its model was permissible and did not require the commission to disqualify itself from adjudicating matters it had previously investigated. (*Id.* at pp. 702-703.)

So too here; the Legislature can charge county superintendents, offices of education, and their governing boards with oversight of charter schools without having to outsource adjudication of charter violations and other alleged

---

*(footnote continued from previous page)*

board's, but as advisorial to a disinterested board charged with arriving at the "best opinion[]" as to whether revocation was warranted.

33

misfeasance. Combining these functions in a unitary agency offers the advantage of ensuring familiarity and expertise. (See, e.g., *Trade Comm'n v. Cement Institute*, *supra*, 333 U.S. at p. 702; *Blinder, Robinson & Co., Inc. v. S.E.C.* (D.C. Cir. 1988) 837 F.2d 1099, 1107.) That a county office is responsible for investigating potential violations does not thereafter preclude the county office's governing board from neutrally evaluating the full range of evidence and argument a given charter school may wish to present at the required public hearing, and when warranted revising any tentative opinions the county office's initial investigation may have led the board to form.

Considering the record as a whole, we conclude the evidence Today's Fresh Start presents establishes neither actual bias nor an unconstitutional risk of actual bias.

## V. *Evidentiary Hearing*

Finally, Today's Fresh Start contends it was denied statutory rights and due process because the evidence upon which the County Board rested its ultimate revocation decision was not formally introduced at the November 6, 2007, public hearing. It is undisputed the County Office's report, recommendation, and supporting documents were delivered to Today's Fresh Start by mid-October, in advance of the hearing, and that Today's Fresh Start had the opportunity to, and did, present its responsive evidence and argument at the public hearing. The question is whether section 47607 or constitutional due process requires the County Office's evidence to also have been presented then. We conclude neither does.

We begin with section 47607 and its text. The statute provides in relevant part: "No later than 30 days after providing the notice of intent to revoke a charter, the chartering authority shall hold a public hearing, in the normal course of business, on the issue of whether evidence exists to revoke the charter." (*Id.*,

subd. (e).) The hearing required is simply a hearing "in the normal course of business." (*Ibid.*) The statute does not suggest that the boards of county offices of education, or those of school districts, should turn their regularly scheduled public meetings into formal evidentiary hearings. Of note, when the Legislature intends to require a formal evidentiary hearing, it knows how to say so. (See, e.g., §§ 8403 [providing for a hearing conducted under the Administrative Procedure Act, including the evidentiary provisions of Gov. Code, § 11513], 44246 [same], 44944, subd. (a)(1) [same], 44948.5, subd. (d) [same], 87675 [same], 94940 [same].) It did not choose similar language here. Nor does the legislative history, which we have examined, offer any indication that the Legislature intended, when requiring a hearing in the normal course of business, to mandate a formal evidentiary hearing.

We thus turn to the question whether the state or federal Constitutions themselves required the County Office to formally present evidence at a prerevocation hearing. There is no presumption in favor of such procedures; the "judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 348; see *Oberholzer v. Commission on Judicial Performance*, *supra*, 20 Cal.4th at p. 392 ["[P]rocedural due process does not require a trial-type hearing in every instance."].) To the contrary, "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." (*Cleveland Board of Education v. Loudermill*, *supra*, 470 U.S. at p. 545.)

Pursuant to *Mathews v. Eldridge*, *supra*, 424 U.S. 319, we consider Today's Fresh Start's argument that the procedures it received were inadequate by evaluating "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards" in light of the private interest at stake and any countervailing government interests. (*Id.* at

35

p. 343; accord, *California Teachers Assn. v. State of California*, *supra*, 20 Cal.4th at p. 347.) In other words, what would the proposed additional procedures add to the fairness and accuracy of the proceedings actually held, and is any such additional benefit constitutionally necessary in light of the respective interests at stake?

It is undisputed Today's Fresh Start received copies of the roughly 500 pages of materials reflecting the County Office's investigation upon which the County Board relied. The school had notice of the November 6, 2007, public hearing and had the opportunity to present written materials in advance of the hearing, as well as arguments from numerous speakers, including counsel, during the hearing itself. Before the County Board's final decision, the school was afforded the chance to address the County Board and argue against revocation on numerous other occasions, including at its October 16, November 20, December 4, and December 11, 2007, board meetings. These proceedings gave Today's Fresh Start both notice of the alleged deficiencies in its operations and numerous chances to respond, in writing and orally, with evidence and arguments for why its charter should not be revoked.

Today's Fresh Start argues that the County Office should have been required to make its case at the November 6 public hearing as well because otherwise the school could not understand the charges against it and rebut the most material points. But in advance of the hearing, the County Office's Corrective Action Plan identified and gave notice to the school of 53 specific problems with the school's operations on matters ranging from student safety to the administration of state tests. That notice was sufficient to afford Today's Fresh Start the opportunity to prepare and submit at the hearing a written rebuttal addressing *every* alleged problem, whether material or not. Today's Fresh Start was told in detail the ways in which its performance was perceived as wanting;

36

that it sharply disagreed with that assessment does not diminish either the notice it had or its opportunity to respond.

Today's Fresh Start's argument that the County Office should have been required to clarify which shortcomings were most critical is essentially an argument that staff should have spent more time making the case for revocation, and that affording the school an unopposed stage to argue its side to the County Board was a due process violation. (But see *Department of Alcoholic Bev. Control v. Alcoholic Bev. etc. Appeals Bd.* (1981) 118 Cal.App.3d 720, 725-726 [rejecting the argument that due process required a unitary agency's investigatory branch to present an argument to its adjudicatory branch so that the party facing a license deprivation could "present an argument in response thereto"].) What Today's Fresh Start describes as a vice (the failure of anyone to argue against its position at the November 6 public hearing) could equally be described as a virtue, allowing the school to present its case without fear of contradiction.

We conclude any increase in the "fairness and reliability" (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 343) of the proceedings from a formal requirement that the chartering authority's staff present anew at the section 47607, subdivision (e) public hearing the case for revocation already disclosed to the school would have been minimal. Admittedly, such a requirement might have focused the County Board on the most salient points for and against revocation. But the board was the body ultimately charged with voting for or against revocation, and its members were capable themselves of raising whatever concerns weighed most heavily in *their* minds and affording the school the chance to allay those concerns.

Given that the additional benefit to be gained from the requirement Today's Fresh Start seeks is at best minimal, it matters not that the school's interest in

avoiding erroneous revocation may well be substantial or the County Office's financial burden of formally presenting evidence anew less than overwhelming.**12** Today's Fresh Start was given the opportunity to be heard "at a meaningful time and in a meaningful manner" (*Armstrong v. Manzo*, *supra*, 380 U.S. at p. 552); "the risk of error inherent in the [prerevocation] procedures chosen by the legislature [was] not so substantial in itself as to require us to depart from the 'ordinary principle' that 'something less than an evidentiary hearing is sufficient prior to adverse administrative action' " (*Mackey v. Montrym* (1979) 443 U.S. 1, 17, quoting *Dixon v. Love* (1977) 431 U.S. 105, 113).

We are mindful in reaching this conclusion that " '[l]egislatures and agencies have significant comparative advantages over courts in identifying and measuring the many costs and benefits of alternative decisionmaking procedures. Thus, while it is imperative that courts retain the power to compel agencies to use decisionmaking procedures that provide a constitutionally adequate level of protection . . . , judges should be cautious in exercising that power. In the vast bulk of circumstances, the procedures chosen by the legislature or by the agency are likely to be based on application of a *Mathews*-type cost-benefit test by an institution positioned better than a court to identify and quantify social costs and benefits.' " (*Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 288, quoting 2 Davis

---

**12**     This is not to say that formal hearings are without cost; presumably, they impose costs at least marginally greater, in terms of staff and board time and resources, than the proceedings conducted here. Even small costs become large when aggregated over many hearings, and "the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 348.)

& Pierce, Administrative Law Treatise (3d ed. 1994) § 9.5, p. 61.) The Legislature's choices here comport with due process.[13]

## DISPOSITION

For the foregoing reasons, we affirm the Court of Appeal's judgment.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

---

[13] *English v. City of Long Beach* (1950) 35 Cal.2d 155 and *La Prade v. Department of Power & Water* (1945) 27 Cal.2d 47, upon which Today's Fresh Start relies, do not suggest a different conclusion. Both cases construed nonconstitutional rights to a hearing and found those rights violated in circumstances where a decision was rendered on evidence never disclosed to the losing party and which the losing party had no opportunity to controvert. (*English*, at p. 158; *La Prade*, at pp. 50-53.) In contrast, section 47607 does not establish a right to a formal evidentiary hearing; moreover, Today's Fresh Start, unlike the writ petitioners in *English* and *La Prade*, had disclosed to it the evidence the County Office was relying upon and had numerous opportunities, in writing and in person, to rebut that showing. (See *Candlestick Properties, Inc. v. San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 570 [correctly reading *English* as confined to circumstances where an administrative body relies on evidence never disclosed to the affected party]; cf. Cal. Code Regs., tit. 5, § 11965, subds. (d)(1), (f)(2), 11968.5.2, subd. (a) [ensuring going forward that the evidence and grounds for considering revocation will be disclosed to charter schools in advance of any § 47607 public hearing].)

**Name of Opinion** Today's Fresh Start, Inc. v. Los Angeles County Office of Education
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 197 Cal.App.4th 436
**Rehearing Granted**

_____

**Opinion No.** S195852
**Date Filed:** July 11, 2013
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James C. Chalfant

_____

**Counsel:**

Vibiana M. Andrade, Sung Yon Lee; Greines, Martin, Stein & Richland, Timothy T. Coates and Alison M. Turner for Defendants and Appellants and for Defendants and Respondents.

Best Best & Krieger, Dina Harris and Megan M. Moore for Riverside County Office of Education and San Diego County Office of Education as Amici Curiae on behalf of Defendants and Appellants and Defendants and Respondents.

David Holmquist and Devora Navera Reed for Los Angeles Unified School District as Amicus Curiae on behalf of Defendants and Appellants and Defendants and Respondents.

Dannis Woliver Kelly, Sue Ann Salmon Evans and William B. Tunick for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants and Defendants and Respondents.

Doll Amir & Eley, Michael M. Amir, Mary Tesh Glarum, Lloyd Vu and Hemmy So for Plaintiff and Respondent and for Plaintiff and Appellant.

Debra J. La Fetra, Damien M. Schiff and Joshua P. Thompson for Pacific Legal Foundation and Options for Youth as Amici Curiae on behalf of Plaintiff and Respondent and Plaintiff and Appellant.

Ricardo J. Soto, Phillipa L. Altmann, Julie Ashby Umansky; McKenna Long & Aldridge and Charles A. Bird for California Charter Schools Association as Amicus Curiae on behalf of Plaintiff and Respondent and Plaintiff and Appellant.

Amy Bisson Holloway, Edmundo R. Aquilar and Todd M. Smith for State Board of Education, California Department of Education and State Superintendent of Public Instruction Tom Torlakson as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael M. Amir
Doll Amir & Eley
1888 Century Park East, Suite 1850
Los Angeles, CA  90067
(310) 557-9100

Alison M. Turner
Greines, Martin, Stein & Richland
5900 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90036-3697
(310) 859-7811