Filed 9/10/25  P. v. Snell CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>LEMELL BENJAMIN SNELL,<br><br>        Defendant and Appellant. | A171772<br><br>(Contra Costa County<br>Super. Ct. No. 042401494)<br><br>**PUBLIC–REDACTED VERSION.\*** |

Defendant Lemell Benjamin Snell was found mentally incompetent to stand trial on charges of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and assault by means likely to produce great bodily injury (§ 245, subd. (a)).  The trial court, relying on reports from mental health experts, later committed defendant to the California Department of State Hospitals (Department) and authorized it to involuntarily administer

---

\*        This case involves material from a sealed record.  In accordance with California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have concurrently filed public (redacted) and sealed (unredacted) versions of this opinion.  We hereby order the unredacted version of this opinion sealed.  Omissions in the public (redacted) version are indicated with the notation "[REDACTED]."

[1]        Further undesignated statutory references are to the Penal Code.

antipsychotic medication pursuant to section 1370, subdivision (a)(2)(B) (section 1370(a)(2)(B)). Defendant appeals, arguing the trial court misinterpreted section 1370(a)(2)(B) and violated his rights to due process and equal protection when it issued the involuntary medication order without first affording him an evidentiary hearing. We disagree, and therefore affirm.

## BACKGROUND

**The Charges**

On July 25, 2024, the district attorney filed a complaint charging defendant with assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and assault by means likely to great bodily injury (§ 245, subd. (a)(4); count 2). The complaint also alleged that defendant personally inflicted great bodily injury in committing both counts, and that he used a deadly weapon (a knife) in committing count 2 (§ 12022, subd. (b)(1)).

**The Competency Proceedings**

On July 26, defense counsel declared a doubt about defendant's competency to stand trial, and the criminal proceedings were suspended. (§ 1368.)

On July 30, the court appointed one psychologist and one psychiatrist to evaluate defendant and address among other issues whether he was competent to stand trial; it was medically appropriate to treat him with antipsychotic medication; he had the capacity to make decisions about such medications; and he presented a danger of inflicting harm on others. (See §§ 1369, 1370(a)(2)(B)(i).)

*Evaluators' Reports*

[REDACTED]

*September 17, 2024 Hearing*

2

At a hearing on September 17, the court noted it had received the mental health experts' reports and that "[b]oth opin[ed] that [defendant] is not competent to stand trial." The court then asked, "Do the parties submit on the reports?" Both the prosecutor and defense counsel replied, "Yes." The court next asked, "Do the parties stipulate that the reports may be deemed in evidence?" And again both counsel answered, "Yes."

The court found, based on the reports, that defendant was not competent to stand trial. The court directed the Contra Costa Conditional Release Program (CONREP) to provide a recommendation regarding an appropriate placement.

After noting the next hearing date was October 15, the court stated [REDACTED]

### CONREP Report

[REDACTED]

### October 15, 2024 Hearing

At the October 15 hearing, defense counsel objected to CONREP's recommendation. Over that objection, the court committed defendant to the Department for a term of two years.

On the issue of involuntary medication, defense counsel "object[ed] to the Court issuing an involuntary medication order" and stated her belief that defendant has "an equal protection and due process right to have an evidentiary hearing." Counsel noted [REDACTED] and re-asserted that defendant was "entitled to an evidentiary hearing."

After the prosecutor submitted on the reports, the court stated, "It is my ongoing belief that the hearing is intended for today on the doctor reports, and I'm unaware of any contrary authority." The court declined to hold an evidentiary hearing and authorized the Department to involuntarily

administer antipsychotic medication to defendant.

That same day, the court issued a written order consistent with its oral rulings. The order stated: "Based on the report of Dr. Horan, the court finds that defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the defendant will result. Additionally, based on the reports of Dr. Kokubun and Dr. Horan, the court finds that the defendant is a danger to others. The court therefore authorizes the administration of antipsychotic medication as needed, including on an involuntary basis, to be administered under the direction and supervision of a licensed psychiatrist."

This timely appeal followed.

## DISCUSSION

In the two main argument headings of his opening brief, defendant asserts that the trial court violated (1) "his procedural due process rights under the Fourteenth Amendment" and (2) his "right to equal protection of law" when it refused to provide him with an adversarial evidentiary hearing that included the right to cross-examine the competency evaluators and any hearsay declarants on whose statements the evaluators relied. (Capitalization and boldface omitted.)

**Preliminary Issues**

At the outset, we address several preliminary issues. First, we clarify defendant's claims on appeal. Although defendant's headings in his opening brief frame the issues solely as constitutional challenges, it appears that within his discussion of the due process issue, he questions whether the trial court properly construed section 1370(a)(2)(B) as a matter of statutory

interpretation. Thus, as we understand it, defendant raises three arguments: that the trial court, in declining to hold an evidentiary hearing, incorrectly interpreted section 1370(a)(2)(B), violated his right to procedural due process, and denied him equal protection under the law.

Next, we consider the People's argument that defendant invited the errors he now complains of. " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' " (*People v. Bailey* (2012) 54 Cal.4th 740, 753.) The People argue the doctrine applies here because at the September 17, 2024 hearing, defense counsel "submitted on the doctors' reports" and "stipulated to the admission of both [evaluators'] reports into evidence."

Defendant counters in his reply brief that the stipulation did not preclude him from later requesting an evidentiary hearing on the involuntary medication issue. He argues that "his trial counsel stipulated that the competency evaluators' reports could be 'deemed in evidence[,]' which was distinct from stipulating that all the information in the reports was true, so [defendant] was not barred from challenging the reports and an involuntary medication order." Defendant thus asserts that "after stipulating to the reports' admissibility, [he] still retained the right to challenge the reliability, credibility, and persuasiveness of the facts and opinions in the reports . . . ."

We agree with defendant that he did not invite the asserted errors when his counsel stipulated that the evaluators' reports "may be deemed in evidence." In entering into that stipulation, counsel agreed to the admissibility of the reports. But a stipulation that evidence is admissible is not equivalent to a stipulation regarding the weight of the evidence, which

addresses how valuable, credible, or reliable the evidence is. (See *People v. Eubanks* (2011) 53 Cal.4th 110, 143 ["questions regarding the validity or the credibility of an expert's knowledge go to the weight of such testimony, not its admissibility"].) Nor was defendant's stipulation a concession "that all the information in the reports was true." (See *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 274 ["A stipulation that evidence is admissible does not equate with the concession of an issue. . . . For example, parties can stipulate to the admission of a toxicology report without conceding that the test subject was drunk or sober."].) Thus, we disagree with the People that the invited error doctrine applies here.

That said, the record arguably demonstrates that defendant forfeited his ability to present live testimony and to cross-examine witnesses, which is the gravamen of his appellate claims. Defendant did not ask to call or cross-examine the competency evaluators or anyone else in the trial court, much less indicate why such examination was necessary or warranted. Rather, his attorney made a general request for an evidentiary hearing without specifying the evidence she wished to adduce or the method by which to do so. To the extent defendant now claims he was deprived of an opportunity to cross-examine the competency evaluators or any other witnesses, such claim is arguably forfeited on appeal. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [" 'an appellate court will not consider claims of error that could have been—but were not—raised in the trial court.' "]; cf. *In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 391 [party arguably forfeited right to live testimony by not asking to testify or cross-examine witnesses, even though he requested an evidentiary hearing].)

But assuming that defendant's request for an evidentiary hearing encompassed a request to cross-examine witnesses, we would reject his

appellate claims on the merits for the reasons discussed below.

**Merits**

As mentioned above, defendant apparently raises three arguments: that the trial court, in declining to hold an evidentiary hearing, misinterpreted section 1370(a)(2)(B), violated his right to procedural due process, and denied him equal protection under the law—each of which presents a question of law we review de novo. (See *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141 [statutory interpretation]; *People v. Marrero* (2021) 60 Cal.App.5th 896, 911 [due process claim]; *People v. Laird* (2018) 27 Cal.App.5th 458, 469 [equal protection claim].)

Recently, in *People v. Lewis* (2025) 111 Cal.App.5th 1078 (*Lewis*) (review denied September 3, 2025), we considered and rejected virtually identical claims. Like defendant here, the defendant in *Lewis* was found incompetent to stand trial and sought an evidentiary hearing on whether the court should authorize the involuntary administration of antipsychotic medication under section 1370(a)(2)(B). The trial court (the Honorable Julia Campins, the same judge who presided over the proceedings in this case) denied the request. The defendant appealed, arguing he was deprived of due process and equal protection when the court issued its involuntary medication order without affording him an evidentiary hearing. He also apparently raised a statutory interpretation challenge. We rejected all of those claims.

Notably, the opening brief in *Lewis* contains almost identical arguments and authorities as in defendant's opening brief in this case. We see no reason to depart from our analysis in *Lewis* and thus apply it to this case, leading us to also reject defendant's claims. We therefore will quote *Lewis* here at length.

Before addressing defendant's arguments, we give an overview of the applicable law.

### General Legal Background

"[A]n individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' " (*Sell v. United States* (2003) 539 U.S. 166, 178 (*Sell*), quoting *Washington v. Harper* (1990) 494 U.S. 210, 221 (*Harper*).) The right is protected by the Fourteenth Amendment (*Sell, supra,* 539 U.S. at p. 178) and by the California Constitution and common law. (*In re Qawi* (2004) 32 Cal.4th 1, 14.)

This right, however, is a qualified one. State prison inmates may exercise this right unless "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (*Harper, supra,* 494 U.S. 210, 227.) Pretrial detainees are entitled to at least the same protection. (*Riggins v. Nevada* (1992) 504 U.S. 127, 135.) Further, the government is permitted to administer antipsychotic drugs involuntarily "to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." (*Sell, supra,* 539 U.S. at p. 179.)

In 2004, the California Legislature amended section 1370 to meet the constitutional standards set forth in *Sell* and added subdivisions (a)(2)(B) and (a)(2)(C), which govern the administration of antipsychotic medication to defendants found incompetent to stand trial (IST defendants). (See *People v. Lameed* (2016) 247 Cal.App.4th 381, 396 (*Lameed*).)

Section 1370(a)(2)(B) currently provides that "[p]rior to making the order directing that the defendant be committed to the State Department of State Hospitals or other treatment facility or placed on outpatient status, . . . [¶] . . . [¶] . . . [t]he court shall *hear and determine* whether the defendant lacks the capacity to make decisions regarding the administration of antipsychotic medication. The court shall consider opinions in the reports prepared pursuant to subdivision (b) of Section 1369,[2] as applicable to the issue of whether the defendant lacks the capacity to make decisions regarding the administration of antipsychotic medication, and shall proceed as follows." (§ 1370(a)(2)(B), italics added.) Section 1370(a)(2)(B)(i) then provides that "[t]he court shall *hear and determine*" whether any of the three conditions in subclauses (I) to (III) is true. (Italics added.) In this case, the court found true the first and second conditions, which are as follows:

Under section 1370(a)(2)(B)(i)(I), the court must determine, "[b]ased upon the opinion of the psychiatrist or licensed psychologist offered to the court . . . , the defendant lacks the capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the [patient] will result."

Under section 1370(a)(2)(B)(i)(II)), the court must determine, "[b]ased

---

[2] Section 1369 sets for the procedures for determining a defendant's mental competence and in subdivision (b) states in relevant part: "A licensed psychologist or psychiatrist shall evaluate the defendant and submit a written report to the court. The report shall include the opinion of the expert regarding all of the following matters[,]" including "whether treatment with antipsychotic medication . . . is appropriate for the defendant." (§ 1369, subds. (b)(1), (b)(2)(A).)

upon the opinion of the psychiatrist or licensed psychologist offered to the court . . . , the defendant is a danger to others, in that the defendant . . . has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in the defendant being taken into custody, and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others."

The third subclause of section 1370(a)(2)(B)(i) essentially tracks the *Sell* factors, and requires the court to determine whether involuntary medication is substantially likely to render the defendant competent to stand trial.  (§ 1370(a)(2)(B)(i)(III); *Lameed*, *supra*, 247 Cal.App.4th at p. 397.)

Where, as here, the court finds any of the conditions in section 1370(a)(2)(B)(i) to be true, the court "shall issue" an order authorizing the involuntary administration of antipsychotic medication for a period of no more than one year.  (§ 1370, subds. (a)(2)(B)(ii)(I)–(III), (a)(2)(B)(iii), (a)(7)(a); *Lameed*, *supra*, 247 Cal.App.4th at pp. 396–397.)

### *Section 1370(a)(2)(B) Does Not Require an Evidentiary Hearing*

We start with defendant's apparent statutory interpretation argument, which is that "the trial court relied on an overly narrow . . . interpretation of [section 1370(a)(2)(B)]."  Defendant does not directly analyze the language of section 1370(a)(2)(B), but asserts that it should be interpreted in a manner similar to other statutes in other contexts—that is, as mandating an evidentiary hearing.

" ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.  [Citation.]  We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " (*People v. Scott* (2014) 58 Cal.4th

10

1415, 1421.)

As recited above, section 1370(a)(2)(B) states that "[t]he court shall hear and determine whether the defendant lacks the capacity to make decisions regarding the administration of antipsychotic medication." And section 1370(a)(2)(B)(i) provides that "[t]he court shall hear and determine" whether any of the three conditions permitting involuntary medication in subclauses (I) to (III) is true. The trial court apparently interpreted these provisions as requiring it to conduct a hearing that included the presentation of oral arguments and consideration of the reports of the appointed mental health experts, but not one that required the presentation of live testimony. This interpretation is consistent with the plain language of the statute. It uses the words "hear and determine" and does not suggest that the court must hold a formal evidentiary hearing, accompanied by the rights to present live testimony and to confront and cross-examine witnesses.

As our Supreme Court explained, "when the Legislature intends to require a formal evidentiary hearing, it knows how to say so." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 228 (*Today's Fresh Start*); see, e.g., § 1473, subd. (e) [stating that where a petitioner who makes a prima facie showing of habeas relief based on the introduction of false scientific or medical evidence at trial or discovery of such evidence, the court shall issue an order to show cause "and hold an evidentiary hearing, unless the state declines to show cause"]; § 1275.1 [providing that bail should not be accepted until a magistrate or judge "at an evidentiary hearing" determines the source of bail funds believed to be feloniously obtained]; Welf. & Inst. Code, § 5326.7, subd. (f) ["If either the attending physician or the attorney believes that the patient does not have the capacity to give a written informed consent [to convulsive treatment] then

11

a petition shall be filed in superior court to determine the patient's capacity to give written informed consent" and "[t]he court shall hold an evidentiary hearing . . . ."].) The Legislature did not choose similar language here.

Nor does the legislative history, which we have examined, offer any indication that the Legislature intended, when requiring the court to "hear and determine" the criteria in section 1370(a)(2)(B), to mandate a formal evidentiary hearing. (See Stats. 2004, ch. 486, Senate Bill No. 1794 (2003–2004 Reg. Sess.).)

Accordingly, we conclude that section 1370(a)(2)(B) does not require courts to conduct an evidentiary hearing prior to issuing an involuntary medication order. (Cf. *Today's Fresh Start, supra*, 57 Cal.4th at p. 228 [holding that language in Ed. Code, § 47607, former subd. (e) that "the chartering authority shall hold a public hearing" did not mandate a formal evidentiary hearing].)

Perhaps recognizing that the plain language of section 1370(a)(2)(B) does not require an evidentiary hearing, defendant asks us to "look by analogy" to section 1203.2 (governing probation revocation proceedings) and Welfare and Institutions Code section 6602 (governing proceedings to determine if there is probable cause that an individual is a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.)).[3] Defendant argues that courts have construed

---

[3]     Section 1203.2, subdivision (b)(1) provides in relevant part: "The court in the county in which the person is supervised has jurisdiction to *hear* the motion or petition [to revoke probation] . . . . After the receipt of a written report from the probation or parole officer, the court shall *read and consider the report* and either its motion or the petition and may modify, revoke, or terminate the supervision of the supervised person upon the grounds set forth in subdivision (a) if the interests of justice so require." (Italics added.) Welfare and Institutions Code section 6602, subdivision (a) provides that at a

these statutes to require an evidentiary hearing, despite the statutes being silent on the specific procedural requirements governing the presentation and admission of evidence. Defendant adds that, with respect to section 1203.2, such a construction was required in order to comport with due process.

Assuming defendant's descriptions of the interpretations of section 1203.2 and Welfare and Institutions Code section 6602 are correct, his claim lacks merit. We previously rejected the very same arguments in *Lewis*. (*Lewis*, *supra*, 111 Cal.App.5th at pp. 1091–1093.) There, we explained: "If the Legislature intended for procedures in the supervision revocation or SVPA context to apply to section 1370(a)(2)(B), it knows how to say so. (See, e.g., § 1026, subd. (c) [providing that the court, at a hearing in determining the propriety of a transfer of a defendant found not guilty by reason of insanity (NGI) between the Department and a public or private treatment facility, 'shall use the same procedures and standards of proof as used in conducting probation revocation hearings pursuant to Section 1203.2.'].) It did not use similar language in section 1370(a)(2)(B)." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1092.)

Furthermore, "[t]o the extent defendant attempts to invoke the rule of statutory interpretation that courts should construe statutes to avoid constitutional infirmities, such rule is inapplicable. (See *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1285.) That rule does not come into play unless the statutory language is reasonably susceptible of two interpretations, one of which raises constitutional doubts. (*Ibid.*, citing

---

probable cause hearing the court "*shall review the petition and shall determine* whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (Italics added.)

13

*People v. Anderson* (1987) 43 Cal.3d 1104, 1146, superseded on other grounds as stated in *People v. Mil* (2012) 53 Cal.4th 400, 408–409; accord, *Johnson v. Arteaga-Martinez* (2022) 596 U.S. 573, 580 [' "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.' " '].)  But as discussed, defendant fails to establish that the text of section 1370(a)(2)(B) is reasonably susceptible to his interpretation." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1093.)

Therefore, we conclude section 1370(a)(2)(B) does not require an evidentiary hearing prior to authorizing the involuntary administration of antipsychotic medication in all cases.  (*Lewis*, *supra*, 111 Cal.App.5th at p. 1093.)

We turn to whether due process principles require such a hearing.

### *Defendant Cannot Demonstrate a Due Process Violation*

#### Due process principles

"The due process clauses of both the federal and state Constitutions forbid the state from depriving individuals of their liberty without due process of law.  (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).)" (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 379.)  An individual bringing a due process claim must demonstrate:  (1) a protected liberty or property interest and; (2) a lack of adequate procedural protections.  (*Today's Fresh Start, supra,* 57 Cal.4th at p. 214.)  Here, there is no dispute that defendant "has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' " (*Sell*, *supra*, 539 U.S. at p. 178, quoting *Harper*, *supra*, 494 U.S. at p. 221.)  " ' "[T]he

14

question remains what process is due.” ’ ” (*Today's Fresh Start, supra,* 57 Cal.4th at p. 214.)

“ ‘[D]ue process is the opportunity to be heard at a meaningful time and in a meaningful manner.’ ” (*Los Angeles Police Protective League v. City of Los Angeles* (2002) 102 Cal.App.4th 85, 91.)  However, “[t]here is no presumption in favor of” holding an evidentiary hearing; the “ ‘judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.’ ” (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 228, citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 348 (*Mathews*); *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 392 [“ ‘[P]rocedural due process does not require a trial-type hearing in every instance.’ ”].

“The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case.” (*Harper*, *supra*, 494 U.S. at 229.)  “[D]ue process is flexible and calls for such procedural protections as the particular situation demands. . . .  [N]ot all situations calling for procedural safeguards call for the same kind of procedure.” (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 (*Morrissey*).)  “[T]he extent to which due process relief will be available depends on a careful and clearly articulated balancing of the interests at stake in each context.” (*People v. Ramirez* (1979) 25 Cal.3d 260, 268.)

More specifically, to determine what process is due, courts apply the balancing test in *Mathews*, which weighs three factors:  (1) the private interest that will be affected by the government action; (2) “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards”; and (3) “the [g]overnment's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews, supra*, 424 U.S. at pp. 334–335; accord, *People v. Ramirez, supra*, 25 Cal.3d at p. 269.)

**Analysis**

Defendant contends that due process required the trial court to provide him with "the hearing procedures articulated . . . in *Harper* and *Morrissey* . . . ."

In *Harper*, the State of Washington confined Harper, a convicted felon, to a facility housing prisoners with serious mental illnesses and treated him with antipsychotic drugs against his will. (*Harper, supra*, 494 U.S. at p. 214.) The high court held that Washington's procedures for authorizing the involuntary medication of inmates satisfied due process. (*Id.* at p. 228.) Those procedures included: notice; a hearing; a neutral and detached trier of fact, namely a hearing committee that included a non-treating psychiatrist, a psychologist, and a superintendent of the center at which inmates were treated for mental disorders; the inmate's right to be present at the adversarial hearing; the inmate's right to cross-examine witnesses; and the right to appeal. (*Id.* at pp. 228, 231, 235.) With respect to the hearing committee, the court rejected Harper's assertion that forcible medication decisions had to be made by judges rather than medical professionals. (*Id.* at pp. 229–231.) The court explained, "The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals." (*Id.* at p. 233.) "A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers." (*Ibid.*)

Defendant contends "[t]hese rights are similar to the 'minimum requirements of due process' that must be granted to parolees facing a loss of

liberty at revocation proceedings," going on to cite *Morrissey*. In *Morrissey*, the high court held that due process required the following procedures at a final parole revocation proceeding: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." (*Morrissey*, *supra*, 408 U.S. at p. 489.)

Defendant asserts in his opening brief that "[a]s will be demonstrated below, the rights and interests at stake when the state seeks to involuntarily medicate a person require at least the same minimum due process safeguards provided to parolees facing revocation of their conditional liberty interest." He adds, "the trial court incorrectly concluded it had the authority to issue an involuntary medication order based on the competency evaluation reports without providing [him] with all the hearing rights articulated in *Harper* and *Morrissey*, particularly the opportunity to present and cross-examine witnesses." Later in his brief, defendant analyzes the *Mathews* factors. Thus, as we understand it, defendant's argument is that based on his evaluation of the *Mathews* factors, due process entitled him to a *Morrissey* or *Harper*-type of hearing that included the right to cross-examine witnesses.

We considered and rejected that very same argument in *Lewis*, concluding that the balance of the *Mathews* factors weighs against requiring an evidentiary hearing prior to a determination under section 1370(a)(2)(B) in all cases. (*Lewis*, *supra*, 111 Cal.App.5th at pp. 1095–1100.) We apply

that analysis here.

"As to the first *Mathews* factor—the private interest affected—there is no dispute that defendant's liberty interest in avoiding the unwanted administration of antipsychotic medication is 'significant.' (*Harper, supra,* 494 U.S. at p. 221.)" (*Lewis, supra,* 111 Cal.App.5th at p. 1096.)

Under the second factor, we consider the risk of an erroneous deprivation of this interest through the procedures used by the trial court, and the probable value, if any, of additional or substitute procedural safeguards. (*Mathews, supra,* 424 U.S. at p. 334.) Here, the trial court's procedures prior to authorizing treatment with antipsychotic medication included, as required under section 1370(a)(2)(B), the consideration of the reports prepared by a licensed psychologist and/or psychiatrist pursuant to section 1369, subdivision (a). The defendant is also afforded a hearing, the right to be present at the hearing, the right to counsel, and the right to have counsel present oral argument on his behalf. The court, however, is not required to provide a formal evidentiary hearing with confrontation and cross-examination in every case. Under these procedures, the risk of an erroneous deprivation of an IST defendant's protected interest, as well as the probable value of the additional procedure of an evidentiary hearing, was minimal. (See *Lewis, supra,* 111 Cal.App.5th at pp. 1096–1098.)

In *Lewis,* we found guidance in *Mathews* and observed that the appropriateness of involuntarily administering antipsychotics is within the purview only of an expert whose opinion is likely to be one of objective assessment that does not regularly implicate credibility or veracity issues, and that such assessments are better suited to written rather than oral presentation. (*Lewis, supra,* 111 Cal.App.5th at pp. 1096–1097.) Specifically, we explained:

18

"[In *Mathews*], the United States Supreme Court held due process did not require an evidentiary hearing prior to an administrative decision whether to terminate Social Security Disability Benefits and held that the administrative procedure in place was constitutionally sufficient. (*Mathews, supra,* 424 U.S. at pp. 340–347.) *Mathews* explained that '[t]he decision whether to discontinue disability benefits will turn, in most cases, upon "routine, standard, and unbiased medical reports by physician specialists." ' (*Id.* at p. 344.) *Mathews* noted that the high court has 'recognized the "reliability and probative worth of written medical reports" emphasizing that while there may be "professional disagreement with the medical conclusions" the "specter of questionable credibility and veracity is not present." ' (*Id.* at pp. 344–345.) Further, where the proof is more amenable to written than oral presentation, such as proof derived from medical sources, the risk of error without oral testimony is diminished. (*Id.* at p. 345 ['the information critical to the entitlement decision usually is derived from medical sources, such as the treating physician. Such sources are likely to be able to communicate more effectively through written documents . . . '].)

"These principles also apply to the decision whether to issue involuntary medication under section 1370(a)(2)(B). That decision, as the trial court noted, must be based on a consideration of a written report by a qualified mental health expert. (§ 1370(a)(2)(B).) The competency statutes envision a careful diagnostic evaluation by a licensed psychologist or psychiatrist and the submission of a report of that evaluation prior to a decision to order involuntary medication. (See §§ 1370(a)(2)(B), 1369, subd. (b).) To the extent such reports are based on the experts' professional conclusions and personal examination of the defendant, as in *Mathews,* the ' "specter of credibility and veracity is not present." ' (*Mathews, supra,* 424

19

U.S. at pp. 344–345.) Further, similar to the physician reports in *Mathews*, the conclusions and recommendations of the mental health experts on the appropriateness of antipsychotic medication are likely more amenable to written than oral presentation. (*Id.* at p. 345.)

"This is not to suggest that the competency evaluators' opinions are infallible and impervious to attacks on grounds of credibility or veracity. But as *Mathews* noted, while 'credibility and veracity may be a factor in the ultimate . . . assessment in some cases[,] . . . procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions.' (*Mathews*, *supra*, 424 U.S. at p. 344.)

"Additionally, here, as in *Mathews*, 'further safeguard[s] against mistake' include the trial court's procedure of granting the defendant and/or his or her attorney 'full access to all information relied upon the state agency.' (*Mathews*, *supra*, 424 U.S. at p. 346.) . . . Moreover, as in *Mathews*, '[o]pportunity is then afforded the [defendant] to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the [psychologist's or psychiatrist's] conclusions.' (*Ibid.*)" (*Lewis*, *supra*, 111 Cal.App.5th at pp. 1096—1097, fn. omitted.)

Further, where there are disputed issues of fact that hinge on credibility and weight of the evidence, the trial court may in its discretion allow for the presentation of live testimony. Such discretion is not "total" or unfettered, as defendant suggests. "[W]hile the court retains the discretion to conduct an evidentiary hearing for the parties to adduce live testimony or cross-examine witnesses where it finds such hearing warranted, such discretion, of course, must be reasoned and must reside within the confines of

the applicable law. (See *People v. Johnson* (2022) 12 Cal.5th 544, 605–606 [' " ' "[T]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' " ' " '].)" (*Lewis, supra,* 111 Cal.App.5th at p. 1097.)

Considering all of the above factors, we conclude that the risk of an arbitrary or erroneous deprivation of defendant's protected interest through the trial court's procedures, and the probable value of additional procedures, is slight. (*Lewis, supra,* 111 Cal.App.5th at p. 1098.)

Defendant nonetheless insists that "[t]he procedures used in this case were insufficient to mitigate the risk of error because they limited [him] to argument by counsel and did not include the right to present or cross-examine witnesses . . . ." Defendant selectively quotes from *Vitek v. Jones* (1980) 445 U.S. 480, 483–484 (*Vitek*)—which addressed due process requirements before transferring a prisoner to a mental health facility as well as retaining the prisoner there indefinitely—the following: "The medical nature of the inquiry . . . does not justify dispensing with due process requirements. It is precisely '[t]he subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings." Defendant then contends: "Although the competency evaluators are appointed by the court rather than called by the government as witnesses, they are still dealing with complex medical inquires with 'subtleties and nuances,' and these evaluators are not omniscient or infallible. . . . Thus, when an incompetent defendant is limited to argument by counsel, who likely does not have the medical training or expertise to identify all potential errors in the competency evaluators' reports, this opportunity to be heard does not adequately reduce the risk of an erroneous deprivation of liberty."

This argument is puzzling. If counsel lacks "the medical training or

expertise to identify all potential errors in the competency evaluators' reports," then, under defendant's logic, counsel could not be reasonably expected to also identify potential errors to explore in cross-examination of those evaluators. Thus, defendant's argument undermines, rather than supports, his broader claim that requiring cross-examination would minimize the risk of erroneous deprivation of an IST defendant's protected interest.

Defendant also recites general legal principles underlying the right of confrontation stated in cases such as "[i]n the *Morrissey* supervision revocation context." (See *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1199 [" 'the opportunity of the accused to observe an adverse witness, while that witness testifies, is a significant aspect of the right of confrontation that may not be dispensed with lightly. [Citations.] Indeed, 'the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process.' "].) However, he provides no meaningful legal analysis explaining how these principles apply to the specific context here. " '[A]n appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146.) "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) We decline to develop defendant's arguments for him. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 546 ["[I]t is not this court's function to serve as [the appellant's] backup appellate counsel."].)

Turning to the final *Mathews* factor, we consider the public interest,

including the fiscal and administrative burdens and societal costs that would be associated with requiring an evidentiary hearing upon demand in all cases prior to the authorization of involuntary medication. (*Mathews*, *supra*, 424 U.S. at p. 347.) In *Lewis*, we concluded this factor, too, weighs against a mandatory evidentiary hearing, explaining:

" '[M]andating additional procedures like live witness testimony subject to cross-examination in every case' would impose significant burdens. The most visible burden would be the delays associated with requiring an evidentiary invariably in all cases. The logistics of holding an evidentiary hearing—including among other things subpoenaing documents and witnesses and addressing legal or evidentiary issues in advance of and during the hearing itself—would require a considerable amount of time to accomplish." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1099.)

In addition, "the delays associated with requiring an evidentiary hearing in all cases would in turn have potentially significant, adverse consequences. 'The primary purpose of the pretrial confinement of incompetent defendants is neither punishment nor rehabilitation, but the restoration of that specific mental state without which the criminal process cannot proceed.' (*People v. G.H.* (2014) 230 Cal.App.4th 1548, 1560.) 'IST defendants' treatment must begin within a constitutionally reasonable period of time.' (*Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691, 713 [(*Stiavetti*)], citing *Jackson v. Indiana* (1972) 406 U.S. 715, 738.) Moreover, the government has a 'substantial interest in timely prosecution' of IST defendants. (*Sell*, *supra*, 539 U.S. at p. 180.) Requiring an evidentiary hearing upon demand in all cases prior to a determination under section 1370(a)(2)(B) runs the risk of violating an IST defendant's constitutional interest in timely treatment and evaluation, as well [undermining] the

government's interest in timely prosecution." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1099.)

"Further, the delays associated with an evidentiary hearing requirement 'not only risk potential harm to the IST defendant individually, but also risk potential harm to other patients.' . . . 'The longer an IST individual remains untreated, the longer he may pose a threat to others at the hospital, or occupy a bed which could be opened for another defendant upon successful treatment. The delays caused by requiring evidentiary hearings may also lead to defendants spending more time in custody pre-commitment, given that § 1370(a)(2) requires the involuntary medication issue to be considered before the commitment order is made.' . . . 'Delay in treatment—especially where the only effective treatment is medication—is against the public interest.' " (*Lewis*, *supra*, 111 Cal.App.5th at p. 1099.)

On top of all that, it cannot "be ignored that the additional procedures would cause the parties, the courts, and witnesses to expend considerable resources." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1100.)

Defendant, however, asserts that the burdens imposed by requiring an evidentiary hearing are "significantly reduced by modern technology for remote testimony," as witnesses "can testify . . . by phone or video call. . . ." We agree that requiring testimony to be conducted remotely would eliminate the need for witnesses and parties to travel to court, thus reducing some time in completing the evidentiary hearing. However, defendant's assertion does not account for the numerous other burdens imposed by a mandatory evidentiary hearing that we have just described.

Defendant also contends that he "is not arguing that all the rules of evidence must apply at an involuntary medication hearing, which *Harper* held was not required . . . , so the more flexible rules would decrease the

length of this hearing and the associated burden on witnesses." This argument is unavailing. As discussed, *Harper* held that due process did not require a judicial hearing prior to ordering treatment of antipsychotic medication to a mentally ill inmate deemed dangerous because it considered such matters best assessed by medical professionals. (See *Harper*, *supra*, 494 U.S. at pp. 231–233.) However, proceedings under section 1370(a)(2)(B) are judicial, not administrative like the proceedings in *Harper*. Administrative proceedings are not subject to all the formal rules of evidence, notice, and timing that apply in a judicial proceeding. (See *Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 291; see also Evid. Code, § 300 [the Evidence Code "applies in every action before the Supreme Court or a court of appeal or superior court . . . ."].)

Defendant next argues that "[t]here is historical evidence that granting incompetent defendants the right to an evidentiary hearing before an involuntary medication order would not present too great of a fiscal or administrative burden." Citing three cases as examples, defendant argues that "[i]n many published opinions over the past two decades examining the sufficiency of the evidence in support of an involuntary medication order, the defendant was afforded an adversarial evidentiary hearing at which the competency evaluator testified." We rejected this very same argument in *Lewis*, explaining: "The fact that there have been several cases in which evidentiary hearings had been conducted hardly constitutes 'historical evidence' to support the notion that requiring evidentiary hearings in all cases 'would not present too great of a fiscal or administrative burden.' " (*Lewis*, *supra*, 111 Cal.App.5th at p. 1100.) We apply that reasoning here.

In sum, we conclude that the *Mathews* factors weigh against requiring a full evidentiary hearing prior to authorizing the involuntary administration

of antipsychotic medication to IST defendants in all cases. Allowing for, but not mandating, an evidentiary hearing permits trial courts to balance the burdens that a full evidentiary hearing imposes while protecting IST defendants from an erroneous deprivation of their protected interests.

Defendant's attempts to analogize to cases in other contexts do not compel a different conclusion. For example, defendant relies on *Morrissey*, which, as noted, held that the due process required certain procedures at a parole revocation hearing, including "the right to confront and cross-examine adverse witnesses" unless good cause for not allowing confrontation is found. (See *Morrissey*, *supra*, 408 U.S. at pp. 486–489.) However, we do not find *Morrissey* on point, as important differences exist between defendant and a parolee. As explained above, the State has a significant interest in acting quickly to treat an IST defendant (*Stiavetti*, *supra*, 65 Cal.App.5th at p. 713) and to prosecute his or her case. (*Sell*, *supra*, 539 U.S. at p. 180.) No comparable interest exists in the supervision revocation context. (See *In re Bye* (1974) 12 Cal.3d 96, 106 ["In the parole situation a delay, while highly undesirable since it may subject one innocent of the alleged violation to prolonged and unnecessary incarceration, does not present a serious threat to the destruction of that degree of rehabilitation which had been achieved prior to the alleged violation."].)

For similar reasons, defendant's reliance on *Vitek* is also misplaced. As noted, *Vitek* addressed a statute authorizing not only the transfer of a prisoner to a mental health facility for evaluation, but also the prisoner's indefinite commitment in the facility. (*Vitek*, *supra*, 445 U.S. at pp. 483–484; see *United States v. Jones* (1987) 811 F.2d 444, 448 ["*Vitek* . . . addresses a statute providing for the indefinite commitment of a prisoner, not merely a transfer for a psychological evaluation"].) And the appropriate procedures

included a hearing before an impartial decisionmaker, which did not need to be a judge, and "an opportunity . . . to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state" except for good cause shown otherwise. (*Id.* at pp. 494–495.) To the extent *Vitek* addressed the circumstance of indefinite commitment and treatment of a mentally ill prison inmate, it is distinguishable from the present case. As explained above, in IST proceedings timing is a critical factor. (See *Stiavetti, supra*, 65 Cal.App.5th at p. 713; *Sell, supra*, 539 U.S. at p. 180.) Moreover, as a bill analysis of a 2012 amendment to section 1370 explains: "mentally ill prison inmates are in very different circumstances than IST defendants. Mentally ill inmates are serving sentences that may be decades long. Many suffer chronic mental illnesses that require long-term medication, even where the need for involuntary medication may arise from a crisis. In contrast, the main purpose for treating IST defendants is to restore them to competency for trial. . . . Ideally, the defendant will be returned to competency through short-term treatment." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 366 (2011–2012 Reg. Sess.), p. 11.)

We next address defendant's argument that "granting incompetent defendants an evidentiary hearing would further the fourth factor under the California Constitution regarding 'the dignitary interest . . . in enabling them to present their side of the story before a responsible government official[.]' . . ." By "fourth factor," defendant means that in addition to the three factors in *Mathews*, California courts "consider a fourth factor, ' "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible governmental official." ' " (*Today's Fresh Start, supra*, 57 Cal.4th at p. 213; see *Conservatorship of Christopher A.* (2006) 139

Cal.App.4th 604, 611.) Defendant contends, without further discussion or argument, that "he did not have the chance to fully present his side of the story." In any event, we disagree. Although defendant was not granted an evidentiary hearing, as explained above, the court's procedures provided him with a meaningful opportunity to present any arguments challenging the evaluators' reports regarding the appropriateness of antipsychotic medication.

Further, defendant's argument that he could not "fully present his side of the story" rings hollow, considering that he did not even present any arguments challenging any specific aspects of the evaluators' reports.[4] And although his counsel made a general request for an evidentiary hearing, she made no specific proffer as to the facts she proposed to adduce, and by what witnesses. Nor was there any specific proffer as to particular lines of cross-examination that required exploration at an evidentiary hearing. Thus, the record shows that defendant was given "the chance to fully present his side of the story," but simply did not avail himself of it.[5]

---

[4] At the October 15, 2024 hearing, defense counsel pointed out the following: "I would also note that Dr. Kokubun indicated in her report that [REDACTED]." However, counsel did not accompany this statement with any argument. Thus, it is unclear what argument, if any, counsel was attempting to make.

[5] Defendant also invokes in passing Probate Code section 4650, subdivision (a), a provision in the "Health Care Decisions Law" (Prob. Code, § 4600 et seq.) that states this finding by the Legislature: " 'In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care . . . .' " But defendant never relied on this provision below. Thus, to the extent defendant argues he was denied the right to control his health care decisions under Probate Code section 4650, he has forfeited the argument. (See *People v. Stowell, supra,* 31 Cal.4th at p. 1114.)

In sum, defendant has failed to demonstrate the trial court violated due process in denying his request for an evidentiary hearing.

### *Defendant Cannot Demonstrate an Equal Protection Violation*

Defendant next asserts that section 1370(a)(2)(B) violates his right to equal protection because it denies him the right to an evidentiary hearing prior to authorization of involuntary administration of antipsychotic medication that is afforded other IST defendants subject to subparagraphs (C) and (D) of section 1370(a)(2) (section 1370(a)(2)(C) and (D)). We considered and rejected an identical argument in *Lewis*. (*Lewis*, *supra*, 111 Cal.App.5th at pp. 1101, 1104–1106, 1110–1111.) We do so here as well.

### Equal Protection Principles

Both the federal and California Constitutions guarantee that no person shall be "den[ied] . . . the equal protection of the laws." (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) "Equal protection of the laws means that similarly situated persons shall be treated similarly unless there is a sufficiently good reason to treat them differently." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326 (*Castel*), citing *People v. Morales* (2016) 63 Cal.4th 399, 408; *Engquist v. Oregon Depart. of Agriculture* (2008) 553 U.S. 591, 602; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

The first step in evaluating any equal protection claim is determining whether there are two groups of individuals who are " ' "similarly situated with respect to the legitimate purpose of the law" ' " but are being treated differently. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107 (*Barrett*).) "If the two groups are not similarly situated or are not being treated differently, then there can be no equal protection violation." (*Castel*, *supra*, 12 Cal.App.5th at p. 1326.) But "if these threshold requirements are met, a court must ascertain whether the Legislature has a constitutionally sufficient

29

reason to treat the groups differently." (*Ibid.*)

**Analysis**

Looking to the first step of the equal protection analysis, defendant argues he is similarly situated to other IST defendants facing involuntary medication under section 1370(a)(2)(C) and (D).

Section 1370(a)(2)(C) provides in pertinent part: "If the defendant consented to antipsychotic medication . . . , but subsequently withdraws their consent, or, if involuntary antipsychotic medication was not ordered pursuant to clause (v) of subparagraph (B), and the treating psychiatrist determines that antipsychotic medication has become medically necessary and appropriate, the treating psychiatrist shall make efforts to obtain informed consent from the defendant for antipsychotic medication. If informed consent is not obtained from the defendant, and the treating psychiatrist is of the opinion that the defendant lacks the capacity to make decisions regarding antipsychotic medication . . . , the treating psychiatrist shall certify whether the lack of capacity and any applicable conditions described above exist. . . ."

Section 1370(a)(2)(D) provides in relevant part: "(i) If the treating psychiatrist certifies that antipsychotic medication has become medically necessary and appropriate pursuant to subparagraph (C), antipsychotic medication may be administered to the defendant for not more than 21 days, provided, however, that, within 72 hours of the certification, the defendant is provided a medication review hearing before an administrative law judge to be conducted at the facility where the defendant is receiving treatment. The treating psychiatrist shall present the case for the certification for involuntary treatment and the defendant shall be represented by an attorney or a patients' rights advocate. . . . The defendant shall also have the following rights with respect to the medication review hearing: [¶] (I) To be

30

given timely access to the defendant's records. [¶] (II) To be present at the hearing, unless the defendant waives that right. [¶] (III) To present evidence at the hearing. [¶] (IV) To question persons presenting evidence supporting involuntary medication. [¶] (V) To make reasonable requests for attendance of witnesses on the defendant's behalf. [¶] (VI) To a hearing conducted in an impartial and informal manner."

"If the administrative law judge determines that the defendant either meets the criteria specified in subclause (I) of clause (i) of subparagraph (B), or meets the criteria specified in subclause (II) of clause (i) of subparagraph (B), antipsychotic medication may continue to be administered to the defendant for the 21-day certification period." (§ 1370(a)(2)(D)(ii).) If the administrative law judge disagrees with the certification, "medication may not be administered involuntarily until the court determines that antipsychotic medication should be administered pursuant to this section." (§ 1370(a)(2)(D)(iii).) Section 1370(a)(2)(D)(iv) then directs that "the court shall provide notice . . . and shall hold a hearing, no later than 18 days from the date of the certification, to determine whether antipsychotic medication should be ordered beyond the certification period."

Here, as we did in *Lewis*, we assume without deciding that individuals subject to involuntary medication under section 1370(a)(2)(B), like defendant, are similarly situated to, and are treated in an unequal manner from individuals subject to section 1370(a)(2)(C) and (D). (*Lewis*, *supra*, 111 Cal.App.5th at p. 1106.)[6] Nonetheless, defendant cannot show an equal

---

[6] In *Lewis*, we noted: " '[T]here is nothing in § 1370(a)(2)(D) that mandates a full evidentiary hearing in front of a superior court judge. At the first step, an administrative law judge conducts an impartial and informal hearing . . . . § 1370(a)(2)(D)(i). That is followed by a 'hearing' in superior court. [(§ 1370(a)(2)(D)(iv).)] At no stage of *this* process does the statute give

31

protection violation since we conclude there is a constitutionally sufficient justification for the difference in treatment. (*Id.* at pp. 1110–1111.)

Initially, we decide what standard applies to determining whether a constitutionally sufficient reason exists for the different treatment. Defendant contends the "strict scrutiny" standard applies, because a fundamental liberty is at stake. We previously rejected the same argument in *Lewis*, concluding that the "rational basis" test applies. (See *Lewis*, *supra*, 111 Cal.App.5th at pp. 1107–1109.) We conclude the same here.

It is true that "California courts have historically used strict scrutiny in evaluating equal protection challenges based on differences among civil commitment schemes." (*People v. Morrison* (2025) 110 Cal.App.5th 702, 715, review granted June 25, 2025, S291041 (*Morrison*).) "But simply asserting that a classification affects a 'liberty' interest proves too much. The California Supreme Court has cautioned against the application of strict scrutiny based solely on the rationale that ' "personal liberty is a fundamental interest." ' " (*Id.* at p. 716, quoting *People v. Williams* (2024) 17 Cal.5th 99, 123.) *Morrison* went on to describe more recent case law considering the applicable standard of scrutiny to various equal protections challenges in the civil commitment context. (*Morrison*, at pp. 717–718.)

In 2010, *People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*)

---

the defendant the right to a formal evidentiary hearing, nor does the statute provide any sort of evidentiary hearing right in superior court.' " (*Lewis*, *supra*, 111 Cal.App.5th at p. 1113.) We continued: "If IST defendants subject to section 1370(a)(2)(C) and (D) do not have the right to a hearing before a superior court judge, then, arguably, individuals subject to section 1370(a)(2)(B) like defendant are not being treated differently. However, we will assume for purposes of the appeal that the right at issue here is the right to an evidentiary hearing before a judge in general and regardless of the application of formal rules of evidence." (*Lewis*, at p. 1106, fn. 9.)

considered a challenge by an SVP to his indefinite commitment. The Supreme Court seems to have applied what purported to be a form of "heightened scrutiny" that appears to be less rigorous than strict scrutiny but more onerous than rational basis scrutiny. (*McKee, supra*, 47 Cal.4th at pp. 1206–1207, 1210–1211 & fns. 13 & 14.) *McKee* explained that it was not applying the "usual judicial deference to legislative findings" consonant with rational basis scrutiny (*id.* at p. 1206,), while simultaneously insisting that it was also not applying strict scrutiny (*id.* at p. 1210, fn. 13). Although *McKee* ultimately remanded for the trial court to "apply[ ] the equal protection principles articulated in [*In re*] *Moye* [(1978) 22 Cal.3d 457 (*Moye*)] and related cases discussed in the present opinion" (*McKee*, at p. 1209)—and *Moye* applied strict scrutiny (*Moye, supra*, 22 Cal.3d at p. 465)—*Moye*'s application of that standard rested on a concession (*ibid.*) and, as noted, *McKee*'s discussion of related cases was not clear regarding which level of scrutiny to apply.

More recently, the Supreme Court in *Barrett* applied rational basis scrutiny to conclude that disparate treatment as to jury trial advisements for persons subject to commitment proceedings under Welfare and Institutions Code section 5300 et seq. (advisement required) and persons subject to LPS proceedings under Welfare and Institutions Code section 6500 et seq. (advisement not required) did not violate equal protection. (*Barrett, supra*, 54 Cal.4th at pp. 1109–1111, fn. 21.) The court reasoned that "an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. [Citation.] Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad

33

discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*Barrett*, at p. 1110.)

We explained in *Lewis* that "appellate courts have reached different conclusions on the appropriate level of scrutiny for evaluating claims of disparate treatment in civil commitments." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1108, fn. 10.) As of the time of our decision in *Lewis*: "In deciding what level of scrutiny to apply to equal protection claims involving nuanced details of civil commitment procedures, recent decisions of the Courts of Appeal have followed *Barrett* and applied rational basis review." (*Morrison*, *supra*, 110 Cal.App.5th at p. 718; see e.g., *People v. Nolasco* (2021) 67 Cal.App.5th 209, 226 (*Nolasco*) [examining timing renewals for individuals declared dangerous because of a " 'developmental disability' " or " 'mental disease, defect, or disorder' "]; *People v. Magana* (2022) 76 Cal.App.5th 310, 324 (*Magana*) [following *Barrett* and concluding rational basis applied to challenge based on the SVPA's failure to require a personal jury trial advisement and waiver, unlike statutes governing trials for other civil commitments]; *Morrison*, at p. 718 ["We agree with [*Nolasco*'s and *Magana*'s] application of the California Supreme Court precedent" and "decide rational basis review applies to Morrison's assertion that his equal protection rights were violated by the SVPA's failure to require a personal jury trial advisement and waiver"]; *People v. Cannon* (2022) 85 Cal.App.5th 786, 798–799 [following *Nolasco* and *Magana* in concluding rational basis review applied in determining whether the SVPA violates equal protection by not requiring a personal waiver of a jury trial right, as other civil commitment statutes require], review granted

Feb. 15, 2023, S277995 (*Cannon*).)[7]

In *Lewis*, we found *Magana* instructive. (See *Lewis*, *supra*, 111 Cal.App.5th at p. 1108.) *Magana* is one of the recent cases noted above that have considered equal protection challenges to civil commitment statutes relating, as here, to secondary or ancillary trial procedures that do not necessarily impact the individual's fundamental rights and, therefore, have applied rational basis review. (*Magana*, *supra*, 76 Cal.App.5th at p. 324 ["Although the indefinite commitment of an alleged SVP affects the individual's fundamental right to liberty, ensuring an alleged SVP has meaningful access to the statutory right to a jury trial, while essential to the exercise of that right, does not affect a fundamental right"].) In *Lewis*, the People argued, and we agreed, that "the same reasoning" of *Magana* "holds true for [defendant's] claim about hearing procedures for involuntary medication orders. It involves a challenge to the process surrounding the right to refuse, not the fundamental right to refuse medication itself." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1108.) "For that reason, as well as the fact that '*Barrett* is the more recent pronouncement by our Supreme Court as to the pertinent level of scrutiny to apply when comparing divergent civil commitment procedures' (*Nolasco*, *supra*, 67 Cal.App.5th at p. 225), we also

---

[7] In *Cannon*, the Supreme Court granted review on the following issue: "What level of scrutiny applies in determining whether the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.) violates equal protection because it does not require an advisement or personal waiver of a jury trial as afforded in other civil commitment statutes." Shortly after we issued our decision in *Lewis*, the Supreme Court granted review in other appellate court cases addressing the same issue in *Cannon*. Among these cases are *Morrison*, *supra*, 110 Cal.App.5th 702, review granted June 25, 2025, S291041, and *People v. Magana* (Mar. 19, 2025, B327869) [nonpub. opn], review granted June 18, 2025, S290583, an unpublished decision in the appeal following issuance of a remand in *Magana*, *supra*, 76 Cal.App.5th 310.

'choose to follow *Barrett*—and hence to apply rational basis scrutiny.' (*Nolasco*, at p. 225.)" (*Lewis, supra*, 111 Cal.App.5th at p. 1108.)

Over two months following our decision in *Lewis*, the Supreme Court issued its decision in *Cannon*. (*People v. Cannon* (Aug. 18, 2025, S277995) ___ Cal.5th ___.) It held, consistent with *Barrett*, that the proper standard of scrutiny for the equal protection challenge presented there is rational basis review. (*Id.* at p. ___.)

In light of this holding, we see no basis to depart from *Lewis*'s analysis and conclusion above. We thus continue to be of the view that rational basis scrutiny should apply to the equal protection challenge here based on the availability of an evidentiary hearing to the two different groups of IST defendants prior to a determination of whether to issue involuntary medication.

As to how to apply that standard, our Supreme Court has explained that the rational basis test "sets a high bar" for litigants challenging legislative enactments. (*People v. Chatman* (2018) 4 Cal.5th 277, 289.) Under the rational basis test, "the legislation survives constitutional scrutiny as long as there is ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) "[A] court may engage in ' "rational speculation" ' as to the justifications for the legislative choice. [Citation.] It is immaterial for rational basis review 'whether or not' any such speculation has "a foundation in the record." (*Id.* at p. 75.) "Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational." (*People v. Chatman, supra*, 4 Cal.5th at p. 289.) The challenger bears the burden to " ' "negative every conceivable basis" ' that might support the disputed statutory disparity." (*Johnson v. Department of Justice, supra*, 60

36

Cal.4th at p. 881.)

Defendant cannot meet this high bar. As explained in *Lewis,* we can "discern a rational basis for the difference in treatment between IST defendants subject to section 1370(a)(2)(B) and IST defendants subject to section 1370(a)(2)(C) and (D)." (*Lewis*, *supra*, 111 Cal.App.5th at p. 1110.) To recap, the differences in the procedures between the two groups are as follows: " 'All IST defendants receive a hearing under § 1370(a)(2)(B); the outcome of that determination separates the two groups. Some will be found incapable of consent and qualify for IVM orders under the conditions specified; the others will not have IVM orders issued, either because the court found they retained the capacity to consent to medication, medication is inappropriate, or the court was unable to reach a determination on the reports provided. Only the latter group will potentially be subject to a § 1370(a)(2)(C)-(D) hearing, and only where there has either been a change in circumstances (such as the defendant withdrawing consent, or a change in the psychiatrist's recommendation) or the determination was too unclear to be made based on the § 1369 reports. The additional hearing procedures under § 1370(a)(2)(C)-(D) are based on the fact that those IST defendants were already subject to a § 1370(a)(2)(B) determination, and originally found not to qualify for the IVM order . . . .' " (*Lewis*, *supra*, 111 Cal.App.5th at p. 1110.)

In *Lewis*, the defendant argued there was " 'no reason' " for the additional procedures in section 1370(a)(2)(C) and (D) " 'simply because the individual's mental health deteriorated, medication has become appropriate, the reports in the first hearing were inadequate, or the individual decided to withdraw consent to medication.' " (*Lewis*, *supra*, 111 Cal.App.5th at p. 1110.) "But the People maintain[ed] that the emergence of those different or

new circumstances following the initial proceedings under section 1370(a)(2)(B) are the point—they assert that '[a]lthough section 1370, subdivision (a)(2)(C)-(D) allows for an administrative hearing followed by superior court review when an involuntary medication decision needs to be revisited, it is rational for the Legislature to reserve those additional procedures for situations where circumstances have changed and there is a specific need to reevaluate an initial determination.' " (*Lewis*, at p. 1110.) We agreed with the People's assertion and therefore concluded that the Legislature had a rational basis for the difference in hearing procedures between IST defendants subject to section 1370(a)(2)(B) on one hand, and IST defendants subject to section 1370(a)(2)(C) and (D) on the other hand. (*Lewis*, at pp. 1110–1111.) We adopt that analysis here.

For all of the above reasons, we hold that defendant has failed to demonstrate an equal protection violation.

### *Any Error Was Harmless*

Assuming for argument's sake the trial court erred in denying defendant's request for an evidentiary hearing, we would conclude any such error was harmless.

Preliminarily, defendant argues that the purported error was "structural" and thus reversible per se. The People, however, argue that the error is subject to harmless error analysis. In *Lewis*, we rejected the same argument raised by defendant here. (*Lewis*, *supra*, 111 Cal.App.5th at p. 1111.) For the reasons stated in *Lewis*, we disagree with defendant that the alleged error here is structural and reversible per se.

"[M]ost errors implicating a federal constitutional right . . . are amenable to harmless error analysis and that only a 'very limited class of cases' are subject to per se reversal." (*People v. Aranda* (2012) 55 Cal.4th

342, 363.)  "Most errors . . . are ' "trial error[s]," ' occurring 'during the presentation of the case to the jury.'  [Citation.]  They are amenable to harmless error review because they can be 'quantitatively assessed in the context of other evidence presented in order to determine whether [their] admission was harmless beyond a reasonable doubt.'  [citation.]  'Structural defects,' on the other hand, 'defy analysis by "harmless-error" standards' [citation] because they are not 'simply an error in the trial process,' but rather an error 'affecting the framework within which the trial proceeds' " (*ibid*.)—for example, "a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element." (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)  "A structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.)

As we concluded in *Lewis*, the asserted error in the denial of an evidentiary hearing is not structural but rather subject to harmless error analysis. (*Lewis*, *supra*, 111 Cal.App.5th at pp. 1111–1112.)  We explained: "The trial court denied defendant's request for an evidentiary hearing at which he could cross-examine the competency evaluator.  This error is analogous to a confrontation clause violation or the denial of a defendant's opportunity to impeach a witness, which errors are subject to harmless error analysis. (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1281, citing *Delaware v. Vans Arsdall* (1986) 475 U.S. 673, 684; see also *People v. Greenberger* (1997) 58 Cal.App.4th 298, 350 ['If it is determined that trial court rulings limiting cross-examination of a witness have denied the defendant his right of confrontation, the error is subject to harmless-error analysis']; accord, *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 395.)  Moreover, on the record before us, it can 'be fairly determined' how the

competency proceedings would have been resolved if the error had not occurred. (*People v. Anzalone, supra*, 56 Cal.4th at p. 554.) Therefore, we evaluate whether the error committed in the present case was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]; *People v. Allen* (2008) 44 Cal.4th 843, 871–872.)" (*Lewis, supra*, 111 Cal.App.5th at p. 1112.)

We apply that analysis here, and conclude that any error in denying an evidentiary hearing was harmless beyond a reasonable doubt.

The crux of defendant's claims of error is that he was entitled to cross-examine the competency evaluators and the hearsay declarants on whose statements the evaluators relied. As to the actual substance of the questioning he argues he should been permitted to conduct on cross-examination, the only developed argument he offers appears in his opening brief's discussion of the equal protection issue and states as follows: "Section 1370, subdivision (a)(2)(B), expressly states: 'A licensed psychologist's opinion shall not exceed the scope of their license.' (§ 1370, subd. (a)(2)(B).) In this case, [REDACTED]. [Defendant] did not have the right to question her about [REDACTED]."

Putting aside that defendant did not raise these contentions below, we conclude that defendant would not have obtained a more favorable ruling had he been permitted to question Dr. Kokubun in the above respects. The apparent purpose of that questioning is to undermine Dr. Kokubun's credibility and the reliability of her opinions. Assuming the damaging potential of the cross-examination had been fully realized in that regard, we nonetheless conclude that any error denying such cross-examination was harmless beyond a reasonable doubt.

While the trial court relied on Dr. Kokubun's report in concluding that

defendant was a danger to others (§ 1370(a)(2)(B)(i)(II)), it also relied on the report of psychiatrist, Dr. Horan. Separately, in concluding that defendant lacked the capacity to make medical decisions regarding antipsychotic medication (§ 1370(a)(2)(B)(i)(I)), the court relied solely on Dr. Horan's report. Thus, the trial court had evidence independent from that of Dr. Kobukun's report from which it could determine whether to authorize involuntary medication.

[REDACTED]

Defendant does not argue that Dr. Horan was unqualified to render her opinions, that her report lacked the requisite information from which the trial court could make a determination on whether to authorize treatment with antipsychotic medication, or that her opinions were unsupported or erroneous. Thus, as best we can tell, the substance of Dr. Horan's report is undisputed.

Because Dr. Horan's report supplied independent, overwhelming evidence to support the involuntary medication order, we are satisfied that any error in denying defendant the opportunity to cross-examine Dr. Kokubun would not have changed the outcome of the proceedings. We thus conclude that any error in the denial of an evidentiary hearing was harmless beyond a reasonable doubt.

**DISPOSITION**

The October 15, 2024 order committing defendant to the Department and authorizing the involuntary administration of antipsychotic medication is affirmed.

_____

RICHMAN, ACTING P. J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A171772N- PUBLIC-REDACTED)